# 24-2656

*In The*

# United States Court Of Appeals
## For The Second Circuit

**BRANDON HUGHES, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,**

*Plaintiff-Appellant,*

**ISRAEL JAMES,**

*Plaintiff,*

**v.**

**NATIONAL FOOTBALL LEAGUE,**

*Defendant-Appellee.*

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK (NEW YORK CITY)
THE HONORABLE JENNIFER LOUISE ROCHON, DISTRICT JUDGE NO. 1:22-CV-10743

———————

**BRIEF OF APPELLANT WITH SPECIAL JOINT APPENDIX**

———————

**Joshua I. Hammack**
**Michael L. Murphy**
**BAILEY & GLASSER, LLP**
**1055 Thomas Jefferson Street, NW**
**Suite 540**
**Washington, DC 20007**
**(202) 463-2101**

*Counsel for Appellant*

# TABLE OF CONTENTS

**Page:**

TABLE OF AUTHORITIES.....................................................................iii

JURISDICTIONAL STATEMENT ........................................................1

ISSUES PRESENTED FOR REVIEW ...................................................1

INTRODUCTION ...................................................................................2

STATEMENT OF THE CASE.................................................................3

    Preliminary Pleadings and Decisions ...............................................5

    The Operative Second Amended Complaint ....................................8

    The NFL's Motion to Dismiss the Second Amended Complaint ....9

    The District Court's Opinion ..........................................................11

    This Court Decides *Salazar*...........................................................12

SUMMARY OF THE ARGUMENT ......................................................16

STANDARD OF REVIEW ...................................................................17

ARGUMENT .........................................................................................17

    I.    Mr. Hughes Has Standing to Assert His VPPA Claim .......................18

    II.    Mr. Hughes Is a Statutory "Consumer" Because He Subscribed to "Goods or Services from a Video Tape Service Provider." ............21

        A.    Mr. Hughes is a statutory "subscriber" because he exchanged personal information for subscriptions to the NFL's online newsletter and to the premium streaming service NFL+.............................................................................24

        B.    The online newsletter and NFL+ are "goods or services.".......25

        C.    The NFL is a "video tape service provider" because it is engaged in the rental, sale, or delivery of "prerecorded video cassette tapes or similar audio visual materials." ..........26

D.      Putting the pieces together: Mr. Hughes is a statutory "consumer," and the district court's contrary conclusion hinges on a convoluted statutory rewrite ..................................28

III.   The District Court Should Address the NFL's Alternative Arguments in the First Instance on Remand ........................................35

CONCLUSION ........................................................................................38

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) ......................................39

CERTIFICATE OF FILING AND SERVICE ........................................................40

# TABLE OF AUTHORITIES

**Page(s):**

**Cases:**

*Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*,
  11 F.4th 138 (2d Cir. 2021)..................................................................36

*Auburn Hous. Auth. v. Martinez*,
  277 F.3d 138 (2d Cir. 2002).................................................................17

*Barnhart v. Sigmon Coal Co.*,
  534 U.S. 438 (2002)..............................................................................21

*BedRoc Ltd., LLC v. United States*,
  541 U.S. 176 (2004)........................................................................21, 23

*Bohnak v. Marsh & McLennon Cos.*,
  79 F.4th 276 (2d Cir. 2023)............................................................13, 20

*City of Pontiac Gen. Emps.' Ret. Sys. v. MBIA, Inc.*,
  637 F.3d 169 (2d Cir. 2011)...........................................................17, 37

*Cruz-Miguel v. Holder*,
  650 F.3d 189 (2d Cir. 2011).................................................................22

*Ct. Nat'l Bank v. Germain*,
  503 U.S. 249 (1992)..............................................................................23

*Czarnionka v. Epoch Times Assoc., Inc.*,
  No. 22 Civ. 6348, 2022 WL 17069810 (S.D.N.Y. Nov. 17, 2022)...............37

*Dep't of Educ. v. Brown*,
  600 U.S. 551 (2023)..............................................................................18

*El Omari v. Int'l Crim. Police Org.*,
  35 F.4th 83 (2d Cir. 2022)....................................................................23

*Fisher v. Aetna Life Ins. Co.*,
  32 F.4th 124 (2d Cir. 2022)..................................................................17

*Henson v. Santander Consumer USA Inc.*,
  582 U.S. 79 (2017)................................................................................22

*Hughes v. National Football League*,
    No. 1:22-cv-10743, 2024 WL 4063740 (S.D.N.Y. Sept. 5, 2024) .................4

*Jama v. Immigration & Customs Enf't*,
    543 U.S. 335 (2005)........................................................................22

*Lamie v. U.S. Trustee*,
    540 U.S. 526 (2004)...........................................................22, 23, 34

*Lerman v. Bd. of Elections in City of New York*,
    232 F.3d 135 (2d Cir. 2000) ...........................................................18

*Mendez v. Barr*,
    960 F.3d 80 (2d Cir. 2020) .............................................................22

*Mohamad v. Palestinian Auth.*,
    566 U.S. 449 (2012)........................................................................22

*Meyer v. Uber Techs., Inc.*,
    868 F.3d 66 (2d Cir. 2017) .............................................................36

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000) ...........................................................21

*Nwozuzu v. Holder*,
    726 F.3d 323 (2d Cir. 2013) ...........................................................21

*Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*,
    469 U.S. 189 (1985)........................................................................23

*Robinson v. Shell Oil Co.*,
    519 U.S. 337 (1997)........................................................................21

*Salazar v. Nat'l Basketball Ass'n*,
    118 F.4th 533 (2d Cir. 2024) ..................................................*passim*

*Salazar v. Nat'l Basketball Ass'n*,
    685 F. Supp. 3d 232 (S.D.N.Y. 2023) ....................................7, 8, 29

*Sandifer v. U.S. Steel Corp.*,
    571 U.S. 220 (2014)........................................................................23

*Singleton v. Wulff*,
　　428 U.S. 106 (1976)................................................................35, 36

*Sosa v. Alvarez-Machain*,
　　542 U.S. 692 (2004)......................................................................22

*Spokeo v. Robins*,
　　578 U.S. 330 (2016)......................................................................19

*TransUnion v. Ramirez*,
　　594 U.S. 413 (2021).............................................................*passim*

*United States v. Gomez*,
　　877 F.3d 76 (2d Cir. 2017).........................................................36

*Wisc. Cent. Ltd. v. United States*,
　　585 U.S. 274 (2018)......................................................................22

*Zepeda-Lopez v. Garland*,
　　38 F.4th 315 (2d Cir. 2022).........................................................21

*Zuni Pub. Sch. Dist. No. 89 v. Dep't of Educ.*,
　　550 U.S. 81 (2007)........................................................................35

**Statutes:**

18 U.S.C. § 2710................................................................*passim*

28 U.S.C. § 1291......................................................................1

28 U.S.C. § 1331......................................................................1

**Constitutional Provisions:**

U.S. Const. art. III.................................................................*passim*

**Rules:**

Fed. R. Civ. P. 12(b)(1)......................................................16, 20

Fed. R. Civ. P. 12(b)(6)............................................................11

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction over Plaintiff's single-count suit under 28 U.S.C. § 1331 because his claim arises under federal law—namely, the Video Privacy Protection Act, 18 U.S.C. § 2710. The district court granted Defendant's motion to dismiss the Second Amended Complaint on September 5, 2024, and entered a corresponding judgment on September 6, 2024. SA.1–13.[1] On October 4, 2023, Plaintiff timely filed a notice of appeal. JA.415. This Court has subject matter jurisdiction to review that final decision under 28 U.S.C. § 1291.

## ISSUES PRESENTED FOR REVIEW

The Video Privacy Protection Act ("VPPA") defines the term "consumer" to include a "subscriber of goods or services from a video tape service provider." 18 U.S.C. 2710(a)(1). This appeal presents the following questions:

(1)     Whether, as this Court has previously held, a VPPA plaintiff has Article III standing because the unauthorized disclosure of personal information to a third party causes a concrete injury.

(2)     Whether, as this Court previously held, the VPPA's reference to "goods or services" includes materials beyond video content or, as the district court held, includes only prerecorded video content.

---

[1] Throughout this brief, Plaintiff will refer to the Special Joint Appendix—which contains the order and judgment under review in this appeal, as well as the text of the statutory provision at issue—with the citation prefix "SA." Plaintiff will refer to the two volumes of the Joint Appendix—which contain all other relevant record materials—with the citation prefix "JA."

# INTRODUCTION

A little over a month after the district court answered the two questions presented in this appeal, this Court decided *Salazar v. National Basketball Association*. There, in a published and unanimous opinion, this Court definitively resolved both questions. As to the first, this Court held that VPPA plaintiffs bringing claims for unauthorized disclosures of their personal information have suffered concrete injuries sufficient to confer Article III standing. Although the district court declined to stay this case pending this Court's decision, it got that much right, correctly declining to grant the NFL's motion to dismiss for lack of standing.

But the court below did not fare so well on the second question. In *Salazar*, the same district judge involved in this case had held that—even though the relevant statutory definition never mentions such a limitation—an individual qualified as a "consumer" only by renting, purchasing, or subscribing to *audio-visual* goods or services. On appeal, this Court disagreed. It held Section 2710(a)(1)'s definition of "consumer" means what it says. In particular, the Court held the VPPA's text, structure, and purpose align to confirm that an individual is a "consumer" if he rents, purchases, or subscribes to "any" of a video tape service provider's "goods or services—audiovisual or not." And it rejected any attempt to "[g]raft[] unstated limitations on the [law's] broad definition of 'consumer.'"

Without the benefit of this Court's guidance, the court below got it wrong a second time. Indeed, it amplified its previous mistake by imposing an *additional* unstated limitation on Section 2710(a)(1)'s definition of "consumer." Here, it held an individual qualifies as a "consumer" only if he watches prerecorded video content. This requirement appears nowhere in the statutory definition of "consumer." Nor does it appear anywhere else in the VPPA. The district court's extra-statutory requirement cannot survive this Court's binding decision in *Salazar*. Instead, as in *Salazar*, its order granting the NFL's motion to dismiss, and its corresponding judgment, must be vacated. On remand, and to the extent necessary, the district court can resolve the NFL's alternative arguments for dismissal in the first instance.

## STATEMENT OF THE CASE

This Court confronted and resolved all the issues presented in this appeal earlier this year. *See Salazar v. Nat'l Basketball Ass'n*, 118 F.4th 533 (2d Cir. 2024). Like the plaintiff in that case, in the operative Second Amended Complaint, Brandon Hughes alleges the NFL violated the VPPA by disclosing his and others' "personally identifiable information" to Facebook without obtaining consent. JA.260–61 (¶¶ 1–2, 5–6). Like the defendant in that case, the NFL filed a motion to dismiss the Second Amended Complaint, arguing—among other things—Mr. Hughes did not meet the statutory definition of a "consumer." JA.342–73. Like the district court in that case, the Honorable Jennifer L. Rochon, District Judge for the Southern District of New

York, granted the NFL's motion with prejudice on those exact grounds. And she did so despite a request to stay proceedings pending the outcome of the *Salazar* appeal.

Indeed, Judge Rochon made the connection between the two cases clear: "For substantially the same reasons stated in *Salazar*, Plaintiff does not plausibly allege that his NFL.com subscription 'render[s] him a consumer of goods or services from a video tape service provider under the VPPA.'" SA.9 (quoting her previous decision in *Salazar*). But the district court addressed one different allegation, too. Mr. Hughes also alleged he subscribed to NFL+, receiving "access to content and features only available to NFL+ subscribers," and watched videos on the NFL App, some of which were "only provided . . . to NFL+ subscribers." SA.9. Thus, the district court agreed Mr. Hughes had plausibly alleged "the video content he accessed was exclusive to a subscribership." SA.9. Still, the court held the allegations established only that Mr. Hughes was a "consumer," not that he was a consumer of a video tape service provider. SA.9–10. On that front, the court held Mr. Hughes's failure to allege "that he viewed prerecorded video content through NFL+" was "fatal." SA.10. The opinion can be found at *Hughes v. National Football League*, No. 1:22-cv-10743, 2024 WL 4063740 (S.D.N.Y. Sept. 5, 2024). This appeal ensued.

4

### Preliminary Pleadings and Decisions

On February 25, 2023, Mr. Hughes filed a First Amended Complaint against the NFL for alleged violations of the VPPA. JA.14–33.[2] Mr. Hughes alleged the NFL violated the VPPA by knowingly disclosing his and others' "personally identifiable information"—which included his Facebook ID and information about which videos he had watched—to Facebook without obtaining consent. JA.14–16 (¶¶ 1–8).

In particular, Mr. Hughes alleged the NFL intentionally installed the Facebook Pixel on NFL.com. JA.15, JA.22 (¶¶ 4, 28–30). This invidious bit of code tracks when users enter the website and what they do there, including which videos they watch. *Id.* Mr. Hughes alleged that, without obtaining consent, the NFL then disclosed users' video-watching histories, along with their Facebook IDs, to Facebook. JA.14–15, JA.22 (¶¶ 1, 4–5, 30). Any ordinary person can use a disclosed Facebook ID to find "the user's Facebook profile and name." JA.22 (¶ 31); *see also* JA.15 (¶ 5) (alleging "any ordinary person" can use a Facebook ID "to quickly and easily locate, access, and view" an individual's "Facebook profile"); JA.23 (¶ 32) (alleging "any ordinary person who comes into possession" of a Facebook ID "can easily identify" the corresponding individual's profile). And the NFL "profit[ed]

---

[2] The First Amended Complaint contained a numbering error, inadvertently repeating paragraph numbers twenty-seven and twenty-eight. JA.20–22. Shortly after the NFL filed its motion to dismiss, Mr. Hughes filed a Corrected First Amended Complaint. JA.115–34. This document corrected the numbering issue. Mr. Hughes's allegations across these two documents were otherwise identical.

handsomely from its unauthorized disclosure[s]," all at the expense of its consumers' "statutorily protected privacy rights." JA.15–16 (¶¶ 6, 8).

Mr. Hughes further alleged the NFL delivers, and is in the business of delivering, "countless hours of video content" through both NFL.com and an app. JA.17 (¶ 13.f). And he alleged he "began a digital subscription to NFL.com in 2020" that "continues to this day." JA.16 (¶ 12); *see also* JA.27 (¶ 44). To obtain this subscription, Mr. Hughes signed up for an online newsletter. JA.19 (¶ 20). During the registration process, the NFL required Mr. Hughes to provide certain personal information, including his name, address, e-mail address, and IP address (*i.e.*, a unique number assigned to devices that reveals the user's "city, zip code and physical location"). JA.19, JA.27 (¶¶ 20, 22, 44). And he alleged the NFL "maintains a vast digital database comprised of its digital subscribers' Personal Viewing Information, including the names and e-mail addresses of each digital subscriber and information reflecting the Video Media that each of its digital subscribers viewed." JA.24 (¶ 34).

After becoming a digital subscriber, Mr. Hughes had access to a variety of NFL.com content, including a broad array of video content. JA.17, JA.20 (¶¶ 13.f, 25). And Mr. Hughes "used his NFL.com digital subscription to view Video Media through NFL.com . . . while logged into his Facebook account." JA.17 (¶ 12). As a result, the NFL disclosed his personally identifiable information—including his Facebook ID and which videos he watched—to Facebook. JA.12, JA.19, JA.22–27,

6

JA.31 (¶¶ 12, 19 28, 30–31, 35, 38–39, 41, 60, 64). These disclosures occurred automatically as the result of the Facebook Pixel the NFL installed on its website. *Id.* But the NFL never informed Mr. Hughes that it would disclose this material to third parties, nor did Mr. Hughes consent to these disclosures. JA.16–17, JA.19–20, JA.22, JA.26–28, JA.31 (¶¶ 12, 19, 24, 26, 27, 40, 46, 62).

Accordingly, Mr. Hughes alleged the NFL "knowingly disclosed to Facebook for its own personal profit the Personal Viewing Information of [its] digital subscribers," including Mr. Hughes, "together with additional sensitive personal information." JA.26 (¶ 39). Facebook and the NFL then used this information to create and display targeted advertising, for which each "received financial remuneration." JA.23 (¶ 33). In this way, the NFL "monetized its database by disclosing subscribers' Personal Viewing Information to Facebook." JA.24 (¶ 35). Further, Mr. Hughes alleged the Facebook Pixel is entirely unnecessary to NFL.com's general operation; it exists and is "deployed . . . for the sole purpose of enriching [the NFL] and Facebook." JA.27 (¶ 42).

The NFL filed a motion to dismiss Mr. Hughes's First Amendment Complaint. JA.84–114. Mr. Hughes opposed that motion. JA.135–58. Before the district court decided that motion, however, it issued an order in *Salazar v. National Basketball Association*—a case involving similar allegations, the same attorneys, and the same judge. *See Salazar v. Nat'l Basketball Ass'n*, 685 F. Supp. 3d 232 (S.D.N.Y. 2023) (decided on August 7, 2023, while the NFL's initial motion to dismiss was pending).

7

The district court's central holding in *Salazar* was that—despite defining the term "consumer" to include those who rent, purchase, or subscribe to "goods or services from a video tape service provider"—"the VPPA only applies to consumers (including subscribers) of audio video services" or of "audio visual materials." *Id.* at 244–45 (agreeing the statutory definition of "consumer" applies only to "a renter, purchaser or subscriber of audio-visual goods or services, and not goods or services writ large"). Because the plaintiff in that case had alleged only a subscription to the NBA's online newsletter, which contained *links* to video content but was not itself video content, the district court held he had not plausibly alleged that he was "a consumer of goods or services from a video tape service provider." *Id.* at 246.

Four days later, on August 11, 2023, in response to the district court's ruling in *Salazar*, Mr. Hughes sought leave to file a Second Amended Complaint. JA.175–99. The NFL opposed that motion. JA.222–37. But the district court granted leave to amend. JA.253–59. At roughly the same time, Mr. Hughes's lawyers—who also represented the plaintiff in *Salazar*—appealed the district court's decision in that case. *See Salazar v. Nat'l Basketball Ass'n*, No. 23-1147, Dkt. No. 1 (2d. Cir.) (showing the plaintiff in *Salazar* filed his notice of appeal on August 10, 2023).

### The Operative Second Amended Complaint

On November 27, 2023, Mr. Hughes filed his Second Amended Complaint against the NFL for alleged violations of the VPPA. JA.260–81. The bones of

Mr. Hughes's Second Amended Complaint were largely unchanged. For example, he alleged the NFL violated the VPPA by disclosing his and others' "personally identifiable information" without consent. JA.260–62 (¶¶ 1–8). Likewise, he alleged that, "[d]uring the relevant time period[,] he has used his NFL.com digital subscription to view Video Media through NFL.com and the NFL App." JA.262–63 (¶ 13). As a result, he alleged the NFL systematically disclosed his "personally identifiable information" to Facebook without his consent. *Id.*

Mr. Hughes's primary changes to the complaint concerned his subscription to NFL+. JA.262–63, JA.265–66, JA.274–75 (¶¶ 12, 20, 22, 48–49). NFL+ is "a digital subscription service . . . that provides exclusive Video Media content to the digital subscriber's desktop, tablet, and mobile device." JA.278 (¶ 65). Mr. Hughes alleged that, via this subscription, he had "access to content and features," including video content, available "only . . . to NFL+ subscribers." JA.274–75 (¶ 48–49).

### The NFL's Motion to Dismiss the Second Amended Complaint

In its renewed motion to dismiss, the NFL advanced two arguments relevant to this appeal. *First*, the NFL argued Mr. Hughes lacked Article III standing because "the disclosure of true, non-misleading, non-reputationally-damaging information" is not a sufficiently concrete harm to count as an injury-in-fact. JA.358–40. *Second*, leaning on the district court's earlier decision in *Salazar*, the NFL argued Mr. Hughes was not a statutory "consumer" by virtue of his newsletter subscription. JA.360–62.

In a new twist, though, it argued even his NFL+ subscription did not render him a "consumer" because he did not allege he viewed "exclusive, prerecorded content." JA.362–67 (arguing a VPPA plaintiff does not "act in the capacity of a 'consumer' of 'goods or services *from* a video tape service provider' when viewing live as opposed to prerecorded content"). To be clear, the NFL admitted it offers prerecorded video content via NFL+. JA.352–53 (admitting this "paid premium service" includes "prerecorded video content," while also noting Mr. Hughes had not specified whether the "content he viewed . . . was live or prerecorded").[3]

In response, Mr. Hughes asked the district court to stay the case pending this Court's resolution of the obviously relevant *Salazar* appeal. JA.384–85. He proceeded to argue that he had Article III standing because—as Supreme Court precedent made clear—the disclosure of private information was a sufficiently concrete intangible harm. JA.385–89. And he argued he had plausibly alleged he was

---

[3] The NFL made several additional arguments in its motion to dismiss. To start, it argued Mr. Hughes failed to allege the NFL "knowingly" disclosed his "personally identifiable information" because (1) he did not allege that his Facebook account contains his name, (2) he alleged only that the NFL "caused" the disclosure, which was executed by his browser or device, not by the NFL itself, and (3) the NFL somehow did not know how the Pixel it installed on its website worked. JA.367–71. The NFL also argued Mr. Hughes's class allegations should be dismissed based on a waiver contained in its Terms and Conditions, to which Mr. Salazar supposedly consented. JA.371–73. As discussed below, the district court did not address, let alone resolve, any of these fact-bound arguments. *See infra* Part III. This Court should not resolve them in the first instance and should, instead, permit the district court to resolve them, if necessary, on remand. *See id.*

a consumer of a good or service from a video tape service provider because he subscribed both to the NFL's online newsletter and to NFL+. JA.389–92.

### The District Court's Opinion

On September 5, 2024, the district court entered an order granting the NFL's motion to dismiss under Rule 12(b)(6). SA.1–12. To start, the court denied Mr. Hughes's request for a stay because the NFL's motion to dismiss raised "several" unspecified "issues that are not implicated in the *Salazar* appeal." SA.7. It then held Mr. Hughes had standing to bring his VPPA claim. SA.8–9. But the district court dismissed his complaint based on its view that Mr. Hughes had failed to allege he was a statutory "consumer." SA.9–11. It held that, "[f]or substantially the same reasons stated in *Salazar*, Plaintiff does not plausibly allege that his NFL.com subscription 'render[s] him a consumer of goods or services from a video tape service provider under the VPPA.'" SA.9 (citation omitted).

As to his separate NFL+ subscription, the court noted it gave Mr. Hughes exclusive access to videos. SA.9. ("Plaintiff sufficiently alleges that 'the video content he accessed was exclusive to a subscribership.'" (citation omitted)). It also noted that the parties *agreed* "NFL+ has prerecorded [video] content." SA.10. But the court held Mr. Hughes's allegations "establish only that [he] was a 'consumer'; they do not establish that Plaintiff was a consumer of 'a video tape service provider.'" SA.9–10. And it based this conclusion on its view that Mr. Hughes had

11

not alleged he watched prerecorded video content via his NFL+ subscription. SA.10 (holding Mr. Hughes's "failure" to "allege that he watched *any* prerecorded videos via NFL+ at all" was "fatal to the Second Amended Complaint").

Given this dispositive holding, the district court did not address the NFL's remaining arguments. SA.9 (declining to address whether the NFL disclosed "personally identifiable information" and whether it did so "knowingly"); SA.11 (declining to address the NFL's class-action waiver argument). The next day— September 6, 2024—the court entered a final judgment. SA.13.

### This Court Decides *Salazar*

On October 4, 2024, Mr. Hughes filed a timely notice of appeal. JA.415. Less than two weeks later—on October 15, 2024—this Court decided *Salazar v. National Basketball Association*, 118 F.4th 533 (2d Cir. 2024). There, this Court confirmed that, while the VPPA may use "terms that invoke a bygone era of video technology," it "is no dinosaur statute." *Id.* at 536, 553. Indeed, although "modern means of consuming [video] content may be different, . . . the VPPA's privacy protections remain as robust today as they were in 1988." *Id.* at 553. And this Court's decision in *Salazar* affirmatively resolved three issues relevant to this appeal.

*First*, this Court applied *TransUnion v. Ramirez*, 594 U.S. 413 (2021), to conclude that the plaintiff had Article III standing. *Salazar*, 118 F.4th at 540–44. "To allege a concrete harm, a plaintiff must point to 'a close historical or common-law

analogue for their asserted injury.'" *Id.* at 541 (quoting *TransUnion*, 594 U.S. at 424). As this Court noted, "[b]oth tangible and intangible harms can satisfy the concreteness requirement." *Id.* Critically, the Court held the injury associated with "the unauthorized disclosure of . . . personal viewing information" in a VPPA case "is closely related to at least one common-law analog traditionally recognized as providing a basis for a lawsuit in American courts: public disclosure of private facts." *Id.* at 540. Indeed, there is "little daylight between the nature of the harm [the plaintiff in *Salazar*] allege[d] and the harm flowing from the public disclosure of private facts." *Id.* at 544. Accordingly, the *Salazar* Court had "no trouble" holding the plaintiff's "alleged harm is sufficiently concrete to withstand dismissal." *Id.* at 542 (relying on *Bohnak v. Marsh & McLennon Cos.*, 79 F.4th 276 (2d Cir. 2023)).

*Second*, this Court reviewed the VPPA's text, structure, and purpose to conclude that the statutory term "'consumer' should be understood to encompass a renter, purchaser, or subscriber of *any* of the [video tape service] provider's 'goods or services'—audiovisual or not." *Id.* at 549. In other words, contrary to the district court's holding in *Salazar*, the term "goods or services" in the VPPA's definition of "consumer" is *not* limited to audio-visual materials. *Id.* at 546–49.

Several facts confirmed this conclusion. For example, Section 2710(a)(1)'s definition of "consumer" referred to "*any* renter, purchaser, *or* subscriber," using two "expansive words . . . that bespeak[] breadth." *Id.* at 546 (internal quotation marks

and citation omitted). And Congress had specifically referred to video materials in other definitions. *See id.* at 547. It did so in Section 2710(a)(4)'s definition of "video tape service provider" and in Section 2710(a)(3)'s definition of "personally identifiable information." But Congress did *not* use video-specific language in Section 2710(a)(1)'s definition of "consumer." "This meaningful variation shows that Congress knew to include an audiovisual limitation in the VPPA when it wanted one to apply." *Id.*; *see also id.* at 548 (noting Congress "chose to *deviate* from any parallelism" between Sections 2710(a)(1) and (a)(4) "by using the terms 'goods or services' in the 'consumer' definition and 'prerecorded video cassette tapes or similar audio-visual materials' in the 'video tape service provider' definition").

Put simply, this Court roundly rejected the argument that Section 2710(a)(1)'s all-encompassing "goods or services" language was somehow "cabin[ed] . . . to *audiovisual* goods or services." *Id.* at 548. It held "[t]he VPPA's text, structure, and purpose compel the conclusion that the phrase is not limited to *audiovisual* 'goods or services.'" *Id.* at 537; *see also id.* at 544, 550 (same). An individual is a statutory "consumer," then, if he is "a renter, purchaser, or subscriber of *any* of the provider's 'goods or services'—audiovisual or not." *Id.* at 549. This Court also held an online newsletter "falls within the plain meaning" of the term "goods or services." *Id.* at 537; *see also id.* at 544 (holding "[t]he phrase 'goods or services' . . . reaches the NBA's online newsletter"). Efforts to reach a contrary conclusion, by "[g]rafting

14

unstated limitations on the broad definition of 'consumer,' and by extension, 'goods or services,'" are "inconsistent with Congress's purpose." *Id.* at 549.

*Third*, this Court held the plaintiff in *Salazar* was a "subscriber" of the NBA's online newsletter because "he provided the NBA with his personal information when he signed up for [it]." *Id.* at 552 (noting the plaintiff had exchanged his e-mail address, IP address, and various cookies associated with his device for the online newsletter and its "periodic NBA-related updates"); *see also id.* at 552–53 (holding that giving an entity "valuable personal information in exchange for access to [an] online newsletter" renders one a "subscriber" to that newsletter). Access to that valuable information "increased the NBA's potential to urge [the plaintiff] to visit NBA.com and watch videos on it." *Id.* at 552. Thus, the exchange made "the NBA's relationship with [the plaintiff] distinct from its relationship with casual NBA.com video-watchers who had not signed up for the newsletter." *Id.*

Accordingly, this Court held the plaintiff in *Salazar* was, in fact, a "subscriber of goods or services" from the NBA, which meant "the district court . . . erred in dismissing his complaint." *Id.* at 553. The Court then left it for "the district court to address the NBA's alternative arguments in the first instance." *Id.*; *see also id.* at 539 & n.4 (explaining the NBA's "alternative arguments" concerned whether (1) it "knowingly" disclosed personally identifiable information, and (2) a supposed class-action waiver in its Terms of Use required dismissal of class allegations).

15

## SUMMARY OF THE ARGUMENT

This Court's recent *Salazar* decision resolves this appeal. To start, the *Salazar* Court held that those bringing VPPA claims based on unauthorized disclosures of personally identifiable information have suffered concrete injuries-in-fact. Accordingly, such individuals have standing under Article III. Even without the benefit of this Court's guidance on the point, the court below got that much right. It correctly denied the NFL's Rule 12(b)(1) motion to dismiss for lack of standing.

Turning to the merits, the VPPA defines "consumer" to include "any . . . subscriber of goods or services from a video tape service provider." As the *Salazar* Court confirmed, this definition contains no limitation, meaning an individual is a "consumer" if he subscribes to "*any* of [a video tape service] provider's 'goods or services'—audiovisual or not." As an example, an online newsletter suffices.

On this front, the court below got it wrong. Indeed, although *Salazar* flatly rejected the same district judge's previous attempt to impose an "unstated limitation" on Section 2710(a)(1)'s definition of "consumer," the court below doubled down. It added *another* "unstated limitation," holding an individual qualifies as a "consumer" only if he watches prerecorded video content. That requirement, which appears nowhere in the VPPA, cannot survive this Court's binding decision in *Salazar*. Accordingly, in this case, as in *Salazar*, the district court's order granting the NFL's motion to dismiss, along with its corresponding judgment, must be vacated.

16

## STANDARD OF REVIEW

This Court reviews a grant of a motion to dismiss *de novo*. *See, e.g.*, *City of Pontiac Gen. Emps.' Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169, 173 (2d Cir. 2011). In doing so, this Court "accept[s] all factual allegations in the complaint as true" and "draw[s] all reasonable inferences in the plaintiff's favor." *Id.* Likewise, the district court's legal conclusions, including its interpretations of a statute, are "reviewed *de novo*." *Id.*; *see also Fisher v. Aetna Life Ins. Co.*, 32 F.4th 124, 135 (2d Cir. 2022) (holding that, [f]or issues concerning statutory interpretation, . . . the standard of review is also de novo"); *Auburn Hous. Auth. v. Martinez*, 277 F.3d 138, 143 (2d Cir. 2002) ("Questions of statutory interpretation are reviewed *de novo*.").

## ARGUMENT

Eleven days after Mr. Hughes filed his appeal, this Court resolved every issue presented here. *First*, this Court decided in *Salazar* that the unauthorized disclosure of an individual's personal information is a concrete injury-in-fact. This holding confirms the district court correctly held that Mr. Hughes has standing to present his VPPA claim. *Second*, the *Salazar* Court held that one who rents, purchases, subscribes to *any* of a video tape service provider's goods or services—regardless of type—is a "consumer" under the VPPA. This holding confirms the district court erred, again, when it held Mr. Hughes was not a statutory "consumer" because he did not subscribe to (or watch) a narrow set of prerecorded video materials.

The only issues *Salazar* does not directly resolve are the alternative arguments for dismissal the district court declined to address. But, even there, *Salazar* leads the way. As this Court did in *Salazar*, those alternative arguments should be left for the district court to resolve in the first instance. And, as in *Salazar*, the district court's order dismissing the complaint, and the associated judgment, should be vacated.

## I.     Mr. Hughes Has Standing to Assert His VPPA Claim.

When a defendant raises doubts about a plaintiff's standing under Article III, that "threshold question" must be answered before the Court can "proceed[] to address the merits." *Lerman v. Bd. of Elections in City of New York*, 232 F.3d 135, 141 n.6 (2d Cir. 2000); *see also Dep't of Educ. v. Brown*, 600 U.S. 551, 560 (2023) ("We have an obligation to assure ourselves of litigants' standing under Article III before proceeding to the merits of a case." (internal quotation marks and citation omitted)). For that reason, Mr. Hughes addresses the NFL's standing argument first.

And the NFL's argument was limited to the concreteness requirement of the injury-in-fact prong of the standing inquiry. Purporting to rely on *TransUnion v. Ramirez*, 594 U.S. 413 (2021), the NFL argued below that Mr. Hughes lacks standing to bring a VPPA claim because "the disclosure of true, non-misleading, non-reputationally-damaging information . . . bear[s] no resemblance to the kind of harms" involved in the tort of public disclosure of private facts. JA.358–60.

This argument profoundly misunderstands *TransUnion*. In that case, the Supreme Court was concerned with ensuring plaintiffs have a "personal stake" in their cases. *TransUnion*, 594 U.S. at 423 (noting "plaintiffs must be able to sufficiently answer the question: 'What's it to you?'"). And the Supreme Court reiterated what it had declared in *Spokeo v. Robins*, which is that "courts should assess whether the alleged injury to the plaintiff has a 'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts." *TransUnion*, 594 U.S. at 424 (quoting *Spokeo v. Robins*, 578 U.S. 330, 341 (2016)). It then noted that "traditional tangible harms, such as physical harms and monetary harms," most obviously qualify as concrete injuries-in-fact. *Id.* at 425.

The Court then pivoted to the somewhat less obvious intangible harms that qualify as concrete injuries-in-fact. There, it proclaimed:

> Various intangible harms can also be concrete. Chief among them are injuries with a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts. Those include, for example, reputational harms, *disclosure of private information*, and intrusion upon seclusion.

*Id.* (emphasis added; citations omitted). Thus, *TransUnion* itself recognized that an individual whose private information has been disclosed without his consent has been concretely harmed and has standing. *See id.*

Of course, the NFL advanced its standing arguments below without the benefit of this Court's guidance in *Salazar*. There, this Court confirmed the harm associated

19

with "the public disclosure of private facts" "readily qualifies as concrete." *Salazar*, 118 F.4th at 541. And it specifically held a VPPA plaintiff alleging an unauthorized disclosure of his video-watching history has "suffered an injury closely related to the public disclosure of private facts analog." *Id.* In particular, that disclosure exposes one's "personally identifiable information to unauthorized third parties," even if it would not give rise to "a common law claim" against the alleged wrongdoer. *Id.* at 541–42 (citing *Bohnak*, 79 F.4th at 285–86). As a result, there is "little daylight between the nature of the harm" involved in a VPPA case alleging an unauthorized disclosure of personally identifiable information "and the harm flowing from the public disclosure of private facts common-law analog." *Id.* at 544. The harm associated with a VPPA violation is a "concrete injury sufficient to confer Article III standing and to withstand dismissal under Rule 12(b)(1)." *Id.*

Here, of course, Mr. Hughes—like the plaintiff in *Salazar*—alleges the NFL disclosed his private information (*i.e.*, his video-watching history) to Facebook without his consent. If *TransUnion* left any doubt about the sufficiency of harms associated with that sort of allegation, *Salazar* removed it. Mr. Hughes has alleged a concrete injury-in-fact and has standing. *Id.* And, even though the NFL never argued otherwise, *Salazar* also explains why Mr. Hughes satisfies the remaining prongs of standing (*i.e.*, that his injury is particularized and actual, traceable to the challenged conduct, and redressable by an order in his favor). *Id.* He clearly has standing.

## II.   Mr. Hughes Is a Statutory "Consumer" Because He Subscribed to "Goods or Services from a Video Tape Service Provider."

Statutory interpretation is not always an easy undertaking. It begins, of course, with the enacted text. *See, e.g.*, *Zepeda-Lopez v. Garland*, 38 F.4th 315, 320 (2d Cir. 2022) ("When interpreting a statutory provision, we begin with the language of the statute."); *Nwozuzu v. Holder*, 726 F.3d 323, 327 (2d Cir. 2013) (same); *Novak v. Kasaks*, 216 F.3d 300, 310 (2d Cir. 2000) ("We look first to the text of the statute."). When the law is unambiguous, the inquiry also ends with the text. *See, e.g.*, *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004) ("[O]ur inquiry begins with the statutory text, and ends there as well if the text is unambiguous."); *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 462 (2002) ("When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.'"); *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997) ("Our inquiry must cease if the statutory language is unambiguous and 'the statutory scheme is coherent and consistent.'"); *Novak*, 216 F.3d at 310 (holding that, if the statutory language "is plain and its meaning sufficiently clear, we need look no further").

But "[t]he plainness or ambiguity of statutory language" must be "determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson*, 519 U.S. at 341. This expansive review, however, is limited to the language actually present in the statute; it does not include previous versions of the statute or language Congress

21

might have used but did not. *See, e.g.*, *Lamie v. U.S. Trustee*, 540 U.S. 526, 534–36 (2004) (focusing on "the existing statutory text" to answer the question).

Still, courts must sometimes compare and contrast the language Congress used in a particular statutory provision with language it used elsewhere. *See, e.g.*, *Wisc. Cent. Ltd. v. United States*, 585 U.S. 274, 279 (2018) (holding courts "usually presume differences in language . . . convey differences in meaning" and Congress's choice to use different language "requires respect, not disregard" (internal quotation marks and citation omitted)); *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 86 (2017) (similar); *Mohamad v. Palestinian Auth.*, 566 U.S. 449, 456 (2012) (similar); *Jama v. Immigration & Customs Enf't*, 543 U.S. 335, 341 (2005) ("We do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply, and our reluctance is even greater when Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest."); *Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 n.9 (2004) (similar); *Mendez v. Barr*, 960 F.3d 80, 87 (2d Cir. 2020) (similar); *Cruz-Miguel v. Holder*, 650 F.3d 189, 196 (2d Cir. 2011) (similar).

In addition, when Congress leaves a term undefined, courts must sometimes fill in the gaps by reference to dictionaries and other sources that might reveal a term's common, everyday meaning. *See, e.g.*, *Wisc. Cent. Ltd.*, 585 U.S. at 277 (explaining that, when interpreting a statutory term, a court's "job is to interpret the

words consistent with their 'ordinary meaning . . . at the time Congress enacted the statute'" (omission in original; citation omitted)); *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 227 (2014) (holding that, when statutory terms are undefined, they "will be interpreted as taking their ordinary, contemporary, common meaning"); *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194 (1985) ("Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose."); *El Omari v. Int'l Crim. Police Org.*, 35 F.4th 83, 88 (2d Cir. 2022), *cert. denied*, 143 S. Ct. 214 (2022) (providing that courts "may look to contemporary dictionary definitions" to assess a term's "ordinary meaning").

All this language-centric methodology flows from the "preeminent canon of statutory interpretation"—namely, that Congress "says in a statute what it means and means in a statute what it says there." *BedRoc*, 541 U.S. at 183; *see also Ct. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992) (describing this interpretive presumption as the "cardinal canon" courts must "always turn . . . to . . . before all others"). When the statutory language is plain and unambiguous, then, "the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms." *Lamie*, 540 U.S. at 534.

In some cases, this kind of painstaking review no doubt requires some heavy lifting. Thankfully, when it comes to interpreting the statutory language at issue in

this case, *Salazar* already did all the hard work. As relevant here, the VPPA defines "consumer" to include "any (1) renter, purchaser, or subscriber (2) of goods or services (3) from a video tape service provider." 18 U.S.C. § 2710(a)(1) (numerals added). As the numerals suggest, there are effectively three relevant requirements. And, in *Salazar*, this Court reviewed and resolved each one's meaning. That decision compels a conclusion that Mr. Hughes qualifies as a statutory "consumer" here. The district court's contrary holding cannot survive *Salazar*'s binding analysis.

>    **A.    Mr. Hughes is a statutory "subscriber" because he exchanged personal information for subscriptions to the NFL's online newsletter and to the premium streaming service NFL+.**

Congress's definition of "consumer" first requires the existence of a "renter, purchaser, or subscriber." 18 U.S.C. § 2710(a)(1). Here, there is no allegation, and no argument, that Mr. Hughes is a "renter" or a "purchaser." The only question is whether he is a "subscriber." On that point, this Court has already held that one can become a "subscriber" even without paying any money. *See Salazar*, 118 F.4th at 551–52 (agreeing with two other appellate courts on the point and noting that, if payment were required, the term "subscriber" would be rendered superfluous).

In addition to a paid subscription, this Court held one may also become a subscriber simply by exchanging "valuable personal information" (*e.g.*, a name, address, e-mail address, IP address, etc.) for some kind of periodic deliverable (*e.g.*, a newsletter). *Id.* at 552–53. This kind of exchange creates a different kind of

relationship between the entity and the subscriber, on the one hand, and the entity and more casual visitors, on the other. *See id.* And that different relationship is enough to check the "subscriber" box of the VPPA's definition of "consumer."

Here, of course, Mr. Hughes alleged he subscribed to two sets of material. *First*, in both the First and Second Amended Complaint, Mr. Hughes alleged he exchanged his personal information—including his name, address, e-mail address, IP address (which reveals his physical location), and cookies associated with his device—for access to the NFL's online newsletter. JA.16–17, JA.19, JA.27, JA.31, JA.262, JA.265–66, JA.274, JA.278 (¶¶ 12, 20, 22 for both; ¶¶ 44, 61 for the First Amended Complaint; ¶¶ 48, 65 for the Second Amended Complaint). *Second*, and only in the Second Amended Complaint—which he filed in response to the district court's then-instructive but now-vacated decision in *Salazar*—Mr. Hughes alleged he exchanged this same personal information for access to exclusive content, including exclusive video content, on the NFL's premium streaming service NFL+. JA.262, JA.265–66, JA.274–75, JA.278 (¶¶ 12, 20, 22, 48–49, 65).

Under *Salazar*, both exchanges qualify Mr. Hughes as a statutory "subscriber." Mr. Hughes clearly checks the first statutory box.

## B. The online newsletter and NFL+ are "goods or services."

Congress's definition of "consumer" next requires that there be a subscriber "of goods or services." 18 U.S.C. § 2710(a)(1). As relevant here, this Court has made

clear that *any* good or service—audiovisual or not—will suffice. *See, e.g.*, *Salazar*, 118 F.4th at 537, 544, 546, 549–50. The relevant statutory phrase simply "is not cabined to only audiovisual 'goods or services.'" *Id.* at 550. As just one example, this Court held an online newsletter satisfies this statutory requirement. *See id.* at 544. And it rejected any attempt to "[g]raft[] unstated limitations" on the term "goods or services" as contrary to law and "inconsistent with Congress's purpose." *Id.*

As discussed above, Mr. Hughes alleged he subscribed to the NFL's online newsletter and to the NFL's premium streaming service NFL+. *See supra* Part II.A. The only relevant question is whether these two items fit within the unlimited category of "goods or services." They do. Indeed, *Salazar* specifically confirmed as much for the online newsletter. *See Salazar*, 118 F.4th at 544. As such, Mr. Hughes's additional allegations about NFL+ in the Second Amended Complaint were unnecessary. Properly understood, his subscription to the NFL's online newsletter was already enough. Still, Mr. Hughes's subscription to NFL+ concerned a "good" or "service," too. Either way, Mr. Hughes checks this second box as well.

### C. The NFL is a "video tape service provider" because it is engaged in the rental, sale, or delivery of "prerecorded video cassette tapes or similar audio visual materials."

Section 2710(a)(1)'s final requirement is that the subscribed-to goods or services come "from a video tape service provider." 18 U.S.C. § 2710(a)(1). At this final stage, the relevant question is whether the NFL is "engaged in the business, in

26

or affecting interstate . . . commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

And, here again, *Salazar* guides the way. There, this Court explained: "The definition [of 'video tape service provider'] is not limited to entities that deal *exclusively* in audiovisual content." *Salazar*, 118 F.4th at 548. Instead, the provision of "audiovisual content need only be *part* of the provider's book of business." *Id.* "Thus, by its plain terms, the statute applies equally to a business dealing primarily in audiovisual materials (think Blockbuster) and one dealing in primarily *non*-audiovisual materials (think a general store that rents out a few movies)." *Id.* A business meets the statutory definition even if it just "dabble[s] in video rentals," and even if it "*also* deal[s] in non-audiovisual goods or services." *Id.* at 548–49.

The NFL never argued below that it was not a video tape service provider. And for good reason. As it admitted in its motion to dismiss, the NFL "offers a paid premium service called NFL+, which provides live *and prerecorded video content*." JA.352 (capitalization altered; emphasis added). Indeed, NFL+ has an entire "library" of on-demand and ad-free video content. *Id.* Mr. Hughes's allegations echo this reality. JA.263, JA.266, JA.277–78 (¶¶ 13.d, 13.f, 25–26, 61–62). And the district acknowledged it as well. SA.2 ("[T]he parties agree that the video content available on NFL+ includes both live and prerecorded content[.]"); SA.10 (noting the "undisputed fact that NFL+ has prerecorded [video] content" and confirming "the parties . . . appear to agree" that "NFL+ has prerecorded content").

27

The NFL's concession that it sells a "paid premium service" that provides exclusive "prerecorded video content" and contains an entire "library" of "on-demand" (and, thus, necessarily prerecorded) video content, JA.352, is dispositive. At the very least, with NFL+, the NFL "dabbles" in the rental, sale, or delivery of prerecorded video content. The law requires no more. That the NFL might also provide live videos changes nothing. Mr. Hughes checks this last box as well.

### D. Putting the pieces together: Mr. Hughes is a statutory "consumer," and the district court's contrary conclusion hinges on a convoluted statutory rewrite.

As shown above, Mr. Hughes is a "subscriber" because he exchanged personal information for a periodic deliverable; he subscribed to two separate and independently sufficient "goods or services" (*i.e.*, an online newsletter and NFL+); and those two goods or services came "from a video tape service provider" (*i.e.*, the NFL, which is engaged in the business of selling "audio visual materials" that are "similar" to "prerecorded video cassette tapes"). *See supra* Parts II.A–C. In simpler terms, Mr. Hughes sufficiently alleged he was a "subscriber" of "goods or services" from a "video tape service provider." That is precisely how the VPPA defines a "consumer." 18 U.S.C. § 2710(a)(1). Mr. Hughes checks every box.

And yet the district court decided he was not a statutory "consumer." It is easy to spot where the court went wrong. Instead of focusing on the language Congress actually used in each independent definition, the district court took a mix-and-match

approach. In *Salazar*, it had rewritten Section 2710(a)(1) to require a subscription not merely to "goods or services" but to "audio-visual goods or services." *Salazar v. Nat'l Basketball Ass'n*, 685 F. Supp. 3d at 244. And it took that extra-statutory requirement from Section 2710(a)(4), believing the definition of "video tape service provider" silently "cabin[s]" the definition of "consumer." *Id.* As this Court explained in *Salazar*, even at this early stage, the district court was already wrong.

Then, when confronted here with allegations that an individual subscribed to "audio-visual goods or services" (*i.e.*, a video-streaming service), which should have been enough to qualify as a consumer under its initial reasoning, the district court changed its tune. Seeing that allegation, the same district judge held that subscribing to audio-visual goods or services was not enough after all. Instead, and although the VPPA never even mentions the word, the court held an individual qualifies as a "consumer" only if he also *watched* prerecorded video content. SA.10.

It is not entirely clear how the district court arrived at this requirement, aside from simply repeating the NFL's misguided argument. JA.363–67 (arguing Mr. Hughes's claim fails because "he does not allege he viewed any *prerecorded* video content," as opposed to live content, and because there was no "nexus" between his subscription to NFL+, on the one hand, and the videos he viewed and the NFL's disclosures, on the other). It appears the court may have borrowed from Section 2710(a)(3)'s discussion of how consumers must interact with video

materials. But that provision does *not* require consumers to "watch" prerecorded video content either. Instead, it provides that "personally identifiable information" exists whenever a consumer "request[s] or obtain[s] specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3).

At this point, it is worth taking a step back. Recall that the VPPA imposes liability on a "video tape service provider" that knowingly discloses "personally identifiable information" about any "consumer." 18 U.S.C. § 2710(b). And it separately defines all three terms—consumer, video tape service provider, and personally identifiable information. The law, however, does not require a consumer to watch *anything*—prerecorded or not—to enjoy the benefits of its protections. The district court's decision simply invented that requirement out of whole cloth.

Whether given materials are prerecorded might be relevant to whether an entity satisfies the statutory definition of "video tape service provider." 18 U.S.C. § 2710(a)(4) (requiring that "video tape service providers" be in the business of renting, selling, or delivering "prerecorded video cassette tapes or similar audio visual materials"). But it has *nothing* to do with whether an individual meets the definition of "consumer" in Section 2710(a)(1) or whether information counts as "personally identifiable information" under Section 2710(a)(3).

For the term "consumer," all that matters is that the individual "rent[s], purchase[s], or subscribe[s]" to "goods or services"—*any* goods or services—"from

30

a video tape service provider." 18 U.S.C. § 2710(a)(1). And whether a given entity is a "video tape service provider" is static. Contrary to the NFL's argument below, entities are not sometimes video tape service providers and sometimes not, depending on the "capacity" they happen to be acting in as to a particular transaction. JA.364 (arguing an entity is not "acting in the capacity of a 'video tape service provider' . . . when delivering live video").

An entity engaged, even occasionally, in the business of renting, selling, or delivering prerecorded video content is *always* a "video tape service provider." And, when it comes to the separately defined term "consumer," it makes no difference whether the good or service one rents, purchases, or subscribes to is a prerecorded video, a live video, an online newsletter, a paper newsletter, an authentic Vince Lombardi Trophy, a replica Vince Lombardi Trophy, a quart of oil, or an oil change. All that matters is that the good or service came from the right kind of entity.

For the term "personally identifiable information," meanwhile, the law requires the protected person (*i.e.*, the "consumer") to have "requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3). It does not require that the consumer rent, purchase, or subscribe to those "video materials or services." Indeed, importing that requirement would be openly inconsistent with Section 2710(a)(3) protection for "request[s]." Nor does this provision require the relevant "video materials or services" to be prerecorded.

Again, Section 2710(a)(4)'s language does not somehow "cabin" or narrow Section 2710(a)(3)'s terms. Thus, the VPPA's protections for "personally identifiable information" extend to *all* the "video materials or services" a consumer "request[s] or obtain[s]" from a "video tape service provider," not just to the prerecorded ones.

An example may help prove the point. Suppose VTSP Corp rents and sells DVDs. It also happens to stream live videos and sell a wide variety of non-video materials, including, but not limited to, concrete cinder blocks, vintage model trains, ceramic coffee mugs shaped like cartoon characters, antique bicycle tires, and handmade chocolates. Under Section 2710(a)(4), VTSP Corp is a "video tape service provider" because it is engaged in the business of renting and selling audiovisual materials that are "similar" to "prerecorded video cassette tapes" (*i.e.*, DVDs). Per the statute, it makes no difference that VTSP Corp is *also* engaged in a string of businesses that would not qualify it for "video tape service provider" status.

Next, suppose Overworked Attorney, having foolishly invited a holiday-adjacent briefing deadline, buys a last-minute box of chocolates from VTSP Corp to give to his mother for Christmas. Under Section 2710(a)(1), Overworked Attorney is a "consumer" because he is a "purchaser" of a "good[] . . . from a video tape service provider" (*i.e.*, chocolates from VTSP Corp). Per the statute, it makes no difference that Overworked Attorney did not buy or rent one of VTSP Corp's DVDs. Nor does it make any difference that Overworked Attorney bought a non-video good.

32

Finally, suppose Overworked Attorney asks VTSP Corp for access to the live stream of The Don't You Wish You Were Here Bowl, which pits his alma mater against a bitter rival in sunny Hawai'i. VTSP Corp informs Overworked Attorney that the live stream for this high-demand football game costs $117.99 per minute. As much as he could use the distraction, Overworked Attorney decides it would be an unwise purchase. Under Section 2710(a)(3), information about this "request[]" for a "specific video material[] or service[] from a video tape service provider" gives rise to protected "personally identifiable information." Per the statute, it does not matter that the requested video material or service was not prerecorded. It does not matter that Overworked Attorney did not "obtain[]" what he requested. VTSP Corp cannot disclose to third parties that Overworked Attorney requested specific video materials or services related to The Don't You Wish You Were Here Bowl.[4]

---

[4] At this point, it is worth noting the NFL did not argue—and the district court did not hold—Mr. Hughes's failure to allege he watched prerecorded video content meant the alleged disclosures lacked "personally identifiable information" under Section 2710(a)(3). Instead, the NFL argued—and the district court held—Mr. Hughes's failure to allege he watched prerecorded video content meant he was not a "consumer" under Section 2710(a)(1). Per *Salazar*, that holding is plainly wrong. *See supra* Part II.B. But a holding tethered to "personally identifiable information" would have been just as wrong. Moreover, even if, counterfactually, Section 2710(a)(3) required consumers to watch prerecorded video content to generate "personally identifiable information," the district court's decision to dismiss the complaint with prejudice would have been reversible error. Without a specific allegation about whether the videos were live or prerecorded, inferences in both directions were equally reasonable. But the district court construed the allegations in the NFL's favor, the exact opposite of what it must do at the motion-to-dismiss stage. And, to the extent a clarification might have been required or helpful, the district court should have invited that clarification via amendment.

To be sure, under the VPPA, VTSP Corp could freely disclose Overworked Attorney's chocolate purchase to third parties. Such information does not identify Overworked Attorney "as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3). Even then, however, VTSP Corp would remain a "video tape service provider," and Overworked Attorney would remain a "consumer." But the disclosure would not result in liability because it does not contain any "personally identifiable information."

That is how the VPPA works. No part of it requires a consumer to have watched anything—whether prerecorded or live. No part of it requires a "nexus" between the material that makes an entity a "video tape service provider" and the material that makes an individual a "consumer." Nor does the law require a "nexus" between the latter material and the "personally identifiable information" a video tape service provider is prohibited from disclosing. Instead, as relevant here, the VPPA provides three separate and independent definitions, which then work in tandem in a single-sentence liability clause. A video tape service provider's knowing disclosure of a consumer's personally identifiable information results in liability, even if the consumer purchased only a non-video good and even if he requested, but did not obtain (let alone watch), the relevant video material or service.

The statute's operation is in no way "absurd." *Lamie*, 540 U.S. at 534. In fact, these broad protections make good sense. *See Salazar*, 118 F.4th at 548–49 (holding

Congress's "broad" and "expansive" language was consistent with its purpose of comprehensively protecting consumers' information). The district court's topsy-turvy approach, meanwhile, reveals the dangers of straying from a statute's text:

> [O]nce one departs from . . . the text . . . fidelity to the intent of Congress is a chancy thing. The only thing we know for certain both Houses of Congress (and the President, if he signed the legislation) agreed upon is the text. . . . [W]hat judges believe Congress "meant" (apart from the text) has a disturbing but entirely unsurprising tendency to be whatever judges think Congress must have meant, *i.e.*, *should* have meant.

> \*          \*          \*

> The only sure indication of what Congress intended is what Congress enacted; and even if there is a difference between the two, the rule of law demands that the latter prevail. . . . We must interpret the law as Congress has written it, not as we would wish it to be.

*Zuni Pub. Sch. Dist. No. 89 v. Dep't of Educ.*, 550 U.S. 81, 116–17, 122 (2007) (Scalia, J., dissenting) (citations omitted). The district court's convoluted statutory rewrite, importing bits and pieces of other provisions into Section 2710(a)(1)'s definition of "consumer," is entirely inconsistent with this Court's binding analysis in *Salazar*. Accordingly, as in *Salazar*, the order granting the NFL's motion to dismiss, as well as the corresponding judgment, must be vacated.

## III.   The District Court Should Address the NFL's Alternative Arguments in the First Instance on Remand.

In general, "a federal appellate court does not consider an issue not passed upon below." *Singleton v. Wulff*, 428 U.S. 106, 120 (1976). There are narrow exceptions to this general rule. For example, an appellate court may decide a

question in the first instance "where the proper resolution is beyond any doubt" or "where injustice might otherwise result." *Id.* at 121 (internal quotation marks and citations omitted). Similarly, it may do so when the issue is "purely legal." *United States v. Gomez*, 877 F.3d 76, 92 (2d Cir. 2017). Still, this Court's "general policy" is "that the trial court should consider arguments . . . in the first instance." *Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 11 F.4th 138, 143 (2d Cir. 2021). And the *Salazar* Court adhered to this time-honored policy. *See Salazar*, 118 F.4th at 553.

Here, the district court expressly declined to reach the NFL's alternative arguments for dismissal. SA.9 (declining to address whether the NFL disclosed "personally identifiable information" and whether it did so "knowingly"); SA.11 (declining to address the NFL's class-action waiver argument). Those arguments are not "purely legal" and instead involve fact questions concerning what the NFL disclosed, the NFL's knowledge and intent, and Mr. Salazar's supposed consent to be bound by the NFL's Terms of Use, which themselves have changed multiple times during the pendency of this case. *See, e.g.*, *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 75–76 (2d Cir. 2017) (holding that notice issues, like those involved here as to the waiver issue, are "clearly a fact-intensive inquiry"); JA.269 (¶ 30) (noting how many times the NFL's privacy policies have been amended). Nor is the resolution of these issues "beyond any doubt." Likewise, permitting the district court to decide them in the first instance would not result in any manifest injustice.

That said, the NFL's alternative arguments for dismissal impermissibly construe alleged facts *against* Mr. Hughes, and sometimes ignore them altogether. For example, the NFL argued its disclosure of Mr. Hughes's Facebook ID did not contain "personally identifiable information" because he did not allege his Facebook page contains his name. JA.367–69. Set aside for the moment that a Facebook ID, by itself, individually identifies the consumer. *See, e.g.*, *Czarnionka v. Epoch Times Assoc., Inc.*, No. 22 Civ. 6348, 2022 WL 17069810, at *3 (S.D.N.Y. Nov. 17, 2022) (holding a Facebook ID "represents a particular individual" and is "equivalent to a name"). At this early stage, Mr. Hughes is entitled to all reasonable inferences. *See, e.g.*, *City of Pontiac*, 637 F.3d at 173. And the inference that Mr. Hughes's personal Facebook page contains his name—at the very least—is eminently reasonable.

Similarly, the NFL argued below that it only "caused" the disclosures at issue, presumably by installing the relevant code, and Mr. Hughes's browser ultimately did the actual disclosing. JA.369–70. This argument ignores Mr. Hughes's allegations that the NFL intentionally installed the Facebook Pixel—the invidious bit of code that tracks, collects, and discloses users' activities—knowing all along how it worked and what it did. JA.261, JA.270–74 (¶¶ 4, 5, 33, 34, 38–40, 43, 46). In short, the NFL intentionally created the system that gave rise to the automatic disclosures at issue in this case. That it programmed them to occur automatically does not change its culpability. Given these allegations, construing all permissible inferences in Mr. Hughes's favor—as the Court must—there is no basis to dismiss here.

Finally, the NFL argued it somehow did not "know" how the Facebook Pixel worked or what information it might disclose. JA.370–71. This contention screams for discovery. Moreover, as discussed above, the argument flatly contradicts Mr. Hughes's allegations. As relevant here, Mr. Hughes alleged the NFL installed the Facebook Pixel specifically "because it benefits financially from the advertising and information services that stem from [its] use." JA.270 (¶ 33). Indeed, he alleged the NFL installed the Facebook Pixel "for the sole purpose of enriching" itself. JA.274 (¶ 46). He also alleged the NFL "knew the Facebook pixel disclosed Personal Viewing Information to Facebook" because it enabled its site and its app "to show targeted advertising" and received money from that advertising. JA.271 (¶ 37). The NFL cannot surmount these allegations. Indeed, at this stage, the Court must accept these allegations as true. There is no basis to dismiss on this ground.

## CONCLUSION

For the foregoing reasons, the order granting the NFL's motion to dismiss and the corresponding judgment should be vacated.

Respectfully submitted,

*/s/ Joshua I. Hammack*
Joshua I. Hammack
Michael L. Murphy
BAILEY & GLASSER, LLP
1055 Thomas Jefferson Street, NW
Suite 540
Washington, DC  20007
(202) 463-2101

*Counsel for Appellant*

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

1. This brief complies with the type-volume limitation because:

    this brief contains <u>9,694</u> words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    this brief has been prepared in a proportional spaced typeface using <u>Microsoft Word</u> in <u>14-point Times New Roman</u>.

This the 20th day of December 2024.

Respectfully submitted,

<u>*/s/ Joshua I. Hammack*</u>
Joshua I. Hammack
Michael L. Murphy
BAILEY & GLASSER, LLP
1055 Thomas Jefferson Street, NW
Suite 540
Washington, DC  20007
(202) 463-2101

*Counsel for Appellant*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on December 20, 2024, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System, which will send notice of such filing to all registered CM/ECF users.

This the 20th day of December 2024.

Respectfully submitted,

*/s/ Joshua I. Hammack*
Joshua I. Hammack
Michael L. Murphy
BAILEY & GLASSER, LLP
1055 Thomas Jefferson Street, NW
Suite 540
Washington, DC 20007
(202) 463-2101

*Counsel for Appellant*

# 24-2656

In The

# United States Court Of Appeals
## For The Second Circuit

## BRANDON HUGHES, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,

*Plaintiff-Appellant,*

### ISRAEL JAMES,

*Plaintiff,*

v.

## NATIONAL FOOTBALL LEAGUE,

*Defendant-Appellee.*

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK (NEW YORK CITY)
THE HONORABLE JENNIFER LOUISE ROCHON, DISTRICT JUDGE NO. 1:22-CV-10743

———————

## SPECIAL JOINT APPENDIX

———————

**Joshua I. Hammack**
**Michael L. Murphy**
**BAILEY & GLASSER, LLP**
**1055 Thomas Jefferson Street, NW**
**Suite 540**
**Washington, DC 20007**
**(202) 463-2101**

*Counsel for Appellant*

**Hilary L. Preston**
**Marisa Antonelli**
**VINSON & ELKINS LLP**
**The Grace Building**
**1114 Avenue of the Americas**
**New York, NY 10036**
**(212) 237-0000**

*Counsel for Appellee*

**Matthew X. Etchemendy**
**VINSON & ELKINS LLP**
**2200 Pennsylvania Avenue, NW**
**Suite 500 West**
**Washington, DC 20037**
**(202) 639-6740**

*Counsel for Appellee*

GibsonMoore Appellate Services, LLC
206 East Cary Street ♦ P.O. Box 1460 (23218) ♦ Richmond, VA 23219
804-249-7770 ♦ www.gibsonmoore.net

# <u>TABLE OF CONTENTS</u>
## Special Joint Appendix

Page:

**Opinion and Order**
    **filed September 5, 2024.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **SA1**

**Judgment**
    **filed September 6, 2024.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **SA13**

**18 U.S.C. § 2710.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **SA14**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

BRANDON HUGHES, individually and on behalf of
all others similarly situated,

Plaintiff,

-against-

NATIONAL FOOTBALL LEAGUE,

Defendant.

Case No. 1:22-cv-10743 (JLR)

**OPINION AND ORDER**

---

JENNIFER L. ROCHON, United States District Judge:

Brandon Hughes ("Plaintiff") sues the National Football League (the "NFL" or "Defendant") under the Video Privacy Protection Act (the "VPPA"), 18 U.S.C. § 2710. Dkt. 79 (the "Second Amended Complaint" or "SAC"). Defendant moves to dismiss under Federal Rule of Civil Procedure ("Rule") 12(b)(1) and Rule 12(b)(6). Dkts. 84 ("Br."), 89 ("Reply"). Plaintiff opposes Defendant's motion. Dkt. 86 ("Opp."). Plaintiff also asks the Court to stay this case pending the Second Circuit's resolution of the appeal of *Salazar v. National Basketball Ass'n*, 685 F. Supp. 3d 232 (S.D.N.Y. 2023), *argued*, No. 23-1147 (2d Cir. Apr. 2, 2024). Opp. at 5-6. Defendant opposes a stay. Dkt. 88.

For the following reasons, the Court denies Plaintiff's request to stay this case, denies Defendant's motion to dismiss under Rule 12(b)(1), and grants Defendant's motion to dismiss under Rule 12(b)(6).

## BACKGROUND

### I.    Factual Allegations

The Court accepts the factual allegations in the Second Amended Complaint as true and draws all reasonable inferences in Plaintiff's favor. *See Costin v. Glens Falls Hosp.*, 103 F.4th 946, 952 (2d Cir. 2024). The Court also considers materials incorporated by reference in the Second

Amended Complaint, integral to the Second Amended Complaint, or subject to judicial notice. *See United States ex rel. Foreman v. AECOM*, 19 F.4th 85, 106 (2d Cir. 2021).

### A.  NFL.com, the NFL App, and NFL+

The NFL is a major American sports league headquartered in New York.  SAC ¶ 13.  It operates three similarly named products or services relevant here: a website called NFL.com, a phone application called the NFL App, and a digital subscription called NFL+.  *Id.* ¶¶ 13, 21, 65.  On NFL.com and the NFL App, users can watch video content.  *Id.* ¶ 13.  NFL+ offers access to exclusive video content on a subscriber's desktop, tablet, and mobile device.  *Id.* ¶ 65.  Although not expressly alleged, *see generally id.*, the parties agree that the video content available on NFL+ includes both live and prerecorded content, *see* Br. at 4; Opp. at 10-11.

An individual may register for NFL.com by signing up for an online newsletter.  SAC ¶ 20.  To do so, an individual provides personal information including her name, email address, and ZIP code.  *Id.*  To register for NFL+, a user must provide her first name, last name, date of birth, and country; she also has the option of providing her ZIP code.  *Id.*  Defendant tracks the IP address used to initiate a subscription to NFL.com or NFL+, thus linking the IP address – and the corresponding physical location – with a specific individual.  *Id.* ¶¶ 20, 22.  Also, any NFL+ subscriber that uses the NFL App provides Defendant with her unique device-identification number, geolocation data, and other information.  *Id.* ¶ 22.

NFL.com has a privacy policy.  *Id.* ¶ 27; *see* ECF No. 83-5 (the "Privacy Policy" in effect at the relevant time).  The Privacy Policy states that Defendant "may collect" certain "types of information when you register with or use our Services . . . [or] access various content or features," including "[c]ontact information," "[d]emographic information," and "[r]eal-time [g]eolocation information."  Privacy Policy § 1; SAC ¶ 27.  The Privacy Policy also states that Defendant "may

use" this information "for a variety of purposes" and provided examples of such uses. Privacy Policy § 2.

NFL.com also has a terms-and-conditions agreement. Dkt. 83-4 (the "Agreement"). Section 19 of the Agreement is captioned "Choice of Law, Arbitration, and Class Action Waiver." *Id.* § 19. It states, among other things, that:

> Any proceedings to resolve or litigate any dispute will be conducted solely on an individual basis. Neither you nor the NFL will seek to have any dispute heard as a class action or in any other proceeding in which either party acts or proposes to act in a representative capacity. No arbitration or proceeding will be combined with another without the prior written consent of all parties to all affected arbitrations or proceedings.

*Id.* (further capitalization omitted).

### B. Defendant's Data Collection and Disclosure

Defendant collects and shares the data and personal information of users of NFL.com and the NFL App with third parties through cookies, software-development kits ("SDKs"), and tracking pixels. SAC ¶ 3. As pertinent here, Plaintiff alleges that Defendant installed Facebook's tracking pixel (the "Facebook Pixel") on NFL.com and the NFL App. *Id.* ¶¶ 4, 35. When a digital subscriber enters NFL.com or the NFL App and watches a video, the Pixel sends certain information to Facebook, including the name of the video, its URL, and the viewer's Facebook identification number (the "FID"). *Id.* ¶¶ 4, 33, 35; *see id.* ¶ 35 ("An FID is a unique and persistent identifier that Facebook assigns to each user. With it, anyone ordinary person [sic] can look up the user's Facebook profile and name."). "Similarly, the NFL App can share user data with Facebook, through the use of one or more of Facebook's SDKs." *Id.* ¶ 34.

Facebook uses the information obtained through the Pixel to show targeted advertisements. *Id.* ¶ 31. Defendant purposefully incorporated the Pixel code on NFL.com and the NFL App, knew that the Pixel would disclose information to Facebook, and financially benefitted from disclosing

this information to Facebook. *Id.* ¶¶ 33, 35, 39, 45. The information transmitted to Facebook is not anonymized, and thus Facebook can either add the data to the information it already has for specific users or use the data to generate new user profiles. *Id.* ¶¶ 39-40.

### C. Plaintiff's Use of NFL.com, the NFL App, and NFL+

Plaintiff, an Illinois resident, has been a digital subscriber of NFL.com from 2020 to the present. *Id.* ¶¶ 12, 48. He has had a Facebook account since 2006. *Id.* ¶ 12. By virtue of his NFL.com digital subscription, Plaintiff receives emails and other communications from Defendant. *Id.* ¶ 48. Also, "[d]uring the relevant time period," Plaintiff "has used his NFL.com digital subscription to view Video Media through NFL.com and the NFL App." *Id.* ¶ 12. When watching videos on NFL.com, Plaintiff was logged into his Facebook account; when watching videos on the NFL App, Plaintiff had the Facebook mobile app also installed on his phone. *Id.* Consequently, when Plaintiff watched videos on either platform, "Plaintiff's Personal Viewing Information was disclosed to Facebook." *Id.*; *see id.* at 1 (defining "Personal Viewing Information" as including a user's FID, "the computer file containing video," and the "corresponding URL viewed").

Plaintiff "was a digital subscriber of NFL+ during, at least, August 2022." *Id.* ¶ 48. Through his NFL+ subscription, Plaintiff received "access to content and features available only to NFL+ subscribers." *Id.* Plaintiff viewed an unidentified number of videos that were "only provided through the NFL App to NFL+ subscribers." *Id.* ¶ 49.

"Plaintiff never gave Defendant express written consent to disclose his Personal Viewing Information." *Id.* ¶ 12. "Plaintiff did not discover that Defendant disclosed his Personal Viewing Information to Facebook until August 2022." *Id.* ¶ 51.

### II.  Procedural History

This litigation kicked off in the Northern District of Illinois on September 14, 2022. Dkt. 1. On January 25, 2023, after the case had been transferred to this District, Dkt. 19, the Court granted

Plaintiff's unopposed motion to file an amended complaint, Dkt. 30; *see* Dkt. 40 (the "First Amended Complaint").  On March 2, 2023, Defendant moved to dismiss the First Amended Complaint.  Dkt. 44.  That motion was fully briefed on April 6, 2023.  Dkt. 63.

On August 7, 2023, the Court granted a motion to dismiss in *Salazar*, a case involving a similar claim under the VPPA.  685 F. Supp. 3d at 235.  Four days later, Plaintiff requested leave to amend in this case.  Dkt. 73.  The Court granted this request over Defendant's opposition and denied as moot Defendant's motion to dismiss the First Amended Complaint.  *Hughes v. Nat'l Football League*, No. 22-cv-10743 (JLR), 2023 WL 8039262, at *1 (S.D.N.Y. Nov. 20, 2023).

Plaintiff filed the Second Amended Complaint on November 27, 2023.  SAC.  He asserts a single claim for relief under the VPPA.  *Id.* ¶¶ 59-70.  He also seeks to represent a proposed class of "[a]ll persons in the United States with a digital subscription to an online website or product owned and/or operated by Defendant that had their Personal Viewing Information disclosed to Facebook by Defendant."  *Id.* ¶ 52; *see id.* ¶ 71 (requesting both individual and class relief).  Defendant moved to dismiss the Second Amended Complaint on December 18, 2023.  Br.  The motion is fully briefed.  Opp.; Reply; *see also* Dkt. 90 (Defendant's submission of supplemental authority).

## LEGAL STANDARD

"A district court properly dismisses an action under [Rule] 12(b)(1) for lack of subject matter jurisdiction if the court lacks the statutory or constitutional power to adjudicate it, such as when the plaintiff lacks constitutional standing to bring the action."  *Brokamp v. James*, 66 F.4th 374, 386 (2d Cir. 2023) (ellipsis, quotation marks, and citation omitted).  To survive a motion to dismiss under Rule 12(b)(6), a "complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Wood v. Moss*, 572 U.S. 744, 757-58 (2014) (citation omitted).  On a motion to dismiss under Rule 12(b)(1) or Rule 12(b)(6), a court accepts the complaint's allegations as true and draws all reasonable inferences in favor of the plaintiff.  *Citizens*

*United to Protect Our Neighborhoods v. Village of Chestnut Ridge*, 98 F.4th 386, 391 (2d Cir. 2024) (Rule 12(b)(1)); *Syeed v. Bloomberg L.P.*, 58 F.4th 64, 67 (2d Cir. 2023) (Rule 12(b)(6)).

**DISCUSSION**

### I.    Stay

As a threshold matter, the Court denies Plaintiff's request to stay this case pending the Second Circuit's disposition of the *Salazar* appeal.

A district court "has broad discretion to stay proceedings as an incident to its power to control its own docket." *Clinton v. Jones*, 520 U.S. 681, 706 (1997).  Relevant considerations include "(1) the private interests of the plaintiffs in proceeding expeditiously with the civil litigation as balanced against the prejudice to the plaintiffs if delayed; (2) the private interests of and burden on the defendants; (3) the interests of the courts; (4) the interests of persons not parties to the civil litigation; and (5) the public interest." *Kappel v. Comfort*, 914 F. Supp. 1056, 1058 (S.D.N.Y. 1996) (citation omitted).  "Of course, these factors are guides to the district court's discretion, not a rigid test requiring mechanical operation." *Press v. Primavera*, No. 21-cv-10971 (JLR), 2024 WL 1621203, at *3 (S.D.N.Y. Apr. 15, 2024).  "The proponent of a stay bears the burden of establishing its need." *Clinton*, 520 U.S. at 708.

Plaintiff notes that some issues raised in the *Salazar* appeal are also implicated in this case, and that other courts in this District have stayed VPPA cases pending the Second Circuit's decision in *Salazar*.  *See* Opp. at 5-6; *see also Addi v. Int'l Bus. Machs., Inc.*, No. 23-cv-05203 (NSR), 2024 WL 2802863, at *5 (S.D.N.Y. May 31, 2024) (collecting cases).  According to Plaintiff, a stay would provide "clarity on the scope of the VPPA before engaging in potentially expensive – and uncertain – litigation."  Opp. at 6 (citation omitted).  To be sure, "[t]his Court has authority to stay proceedings pending disposition of another case that could affect the outcome."  *Pry v. Auto-Chlor Sys., LLC*, No. 23-cv-04541 (DEH), 2024 WL 3728981, at *1 (S.D.N.Y. Aug. 8, 2024) (citation

**-SA6-**

omitted).  Nevertheless, Defendant's motion to dismiss the Second Amended Complaint has been fully briefed for some time and, more importantly, raises several issues that are not implicated in the *Salazar* appeal.  The Court finds that the interests of Defendant, the Court, and the public in resolving cases in a reasonably timely fashion outweigh countervailing considerations.  *See Press*, 2024 WL 1621203, at \*5.  Therefore, the Court denies Plaintiff's stay request.

## II.    Standing

The Court turns next to Defendant's Rule 12(b)(1) motion challenging Plaintiff's standing. To establish Article III standing, "a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief."  *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021).  Invoking *TransUnion*, Defendant asserts that Plaintiff cannot "identify a close historical or common-law analogue for his asserted injury that has been traditionally recognized as a basis for suit."  Br. at 11 (brackets, quotation marks, and citation omitted).  In *Salazar*, however, the Court held that VPPA claims of this sort are sufficiently analogous to the tort of intrusion upon seclusion to satisfy *TransUnion*.  *See* 685 F. Supp. 3d at 239-42.  The Court's view on this issue has not changed.

Defendant makes one argument that was not raised in *Salazar* and that the Court therefore addresses now.  According to Defendant, Plaintiff "consented to the alleged disclosures through his notice of, and agreement to, Facebook's policies and the NFL's Privacy Policy, both of which alerted him to the cookie-based tracking and ad customization technologies he now complains of." Br. at 12.  In turn, Defendant argues that a "disclosure to which an individual consented is not a harm that is traditionally recognized as giving rise to a viable tort suit."  *Id.* (quotation marks omitted).  "Rather, consent provides an 'absolute privilege' from traditional privacy torts."  *Id.* (quoting Restatement (Second) of Torts § 652F cmt. b (Am. L. Inst. 1977)).

**-SA7-**

This argument does not advance the ball. It is true that consent may provide an affirmative defense to a privacy tort. *See, e.g.*, *Lewis v. LeGrow*, 670 N.W.2d 675, 688 (Mich. Ct. App. 2003) (under Michigan law, "there can be no invasion of privacy under the theory of intrusion upon the seclusion" if the plaintiff "consented to [the] defendant's intrusion"); *Noble v. Town Sports Int'l, Inc.*, 707 N.Y.S.2d 89, 90 (1st Dep't 2000) (models "provided written consent, without limitation, to the use and reuse of the photographs for advertising purposes . . . , thus waiving any invasion of privacy claim" under New York statute); *Anderson v. Low Rent Hous. Comm'n of Muscatine*, 304 N.W.2d 239, 248 (Iowa 1981) (under Iowa law, "waiver and consent" are "affirmative defenses" to "the tort of invasion of privacy"). But Plaintiff does not allege that he consented to Defendant sharing his personally identifying information with Facebook; in fact, he alleges the opposite. *See, e.g.*, SAC ¶ 12 ("Plaintiff never gave Defendant express written consent to disclose his Personal Viewing Information."). Moreover, if Plaintiff indeed validly consented to Defendant sharing his personally identifying information with Facebook (something that is not obvious from the evidence highlighted by Defendant), that fact could support an affirmative defense to an intrusion-on-seclusion claim and, potentially, a VPPA claim, *see, e.g.*, *Anderson*, 304 N.W.2d at 248; *Feldman v. Star Trib. Media Co.*, 659 F. Supp. 3d 1006, 1023 (D. Minn. 2023) (18 U.S.C. § 2710(b)(2)(B), which establishes a safe harbor for VPPA claims based on a plaintiff's consent, "seems like an affirmative defense that the [defendant] bears the burden to plead and prove"), but it does not mean that Plaintiff lacks standing to assert a VPPA claim at this juncture, *see, e.g.*, *Pileggi v. Wash. Newspaper Publ'g Co.*, No. 23-cv-00345, 2024 WL 324121, at *7-8 (D.D.C. Jan. 29, 2024) (rejecting defendant's argument that plaintiff, by continuing to visit website with publicly accessible privacy policy, impliedly consented to disclosure and therefore lacked standing to assert VPPA claim); *cf. Wakefield v. ViSalus, Inc.*, 51 F.4th 1109, 1118 n.7 (9th Cir. 2022) (in case brought under the Telephone Consumer Protection Act (the "TCPA"), defendant argued that plaintiffs lacked

-SA8-

standing because they consented to defendant's calls; court rejected this argument because "[e]xpress consent is an affirmative defense" under the TCPA, and "determining whether [p]laintiffs consented to [defendant]'s calls require[d] an analysis of the merits" of plaintiffs' TCPA claim (ellipsis and citation omitted)).

Thus, the Court denies Defendant's motion to dismiss under Rule 12(b)(1).

### III.    Merits

In seeking dismissal under Rule 12(b)(6) for failure to state a claim, Defendant argues that Plaintiff fails to allege facts to support three elements of his claim: (1) that Plaintiff is a "consumer" of a "video tape service provider"; (2) that Defendant "disclose[d]" "personally identifying information"; and (3) that this disclosure was made "knowingly."  Br. at 12 (brackets in original) (quoting 18 U.S.C. § 2710).  The Court agrees with Defendant on the first point; it does not address the other two.

The VPPA defines "consumer" as "any renter, purchaser, or subscriber of goods or services from a video tape service provider."  18 U.S.C. § 2710(a)(1).  Neither party asserts that Plaintiff is a renter or purchaser.  Instead, the parties focus on whether Plaintiff is a subscriber.

For substantially the same reasons stated in *Salazar*, Plaintiff does not plausibly allege that his NFL.com subscription "render[s] him a consumer of goods or services from a video tape service provider under the VPPA."  685 F. Supp. 3d at 246.  Unlike in *Salazar*, however, Plaintiff asserts an additional basis for qualifying as a "subscriber" and, thus, as a "consumer": his subscription to NFL+.  SAC ¶ 65.  Plaintiff alleges that as part of his subscription to NFL+, he received "access to content and features only available to NFL+ subscribers."  *Id.* ¶ 48.  Plaintiff also claims that he watched videos through the NFL App, and that "[s]ome of the viewed content was only provided through the NFL App to NFL+ subscribers."  *Id.* ¶ 49.  Thus, Plaintiff sufficiently alleges that "the video content he accessed was exclusive to a subscribership."  685 F. Supp. 3d at 245.  These

allegations, however, establish only that Plaintiff was a "consumer"; they do not establish that Plaintiff was a consumer of "a video tape service provider."

Defendant argues that Plaintiff is not a consumer of a "video tape service provider" because he "does not allege he viewed any *prerecorded* video content whatsoever through his subscription" to NFL+.  Br. at 15-17; *see* 18 U.S.C. § 2710(a)(4) (under the VPPA, "the term 'video tape service provider' means any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials").  Plaintiff, in response, "readily concedes" that the VPPA applies only to prerecorded content.  Opp. at 11.  But Plaintiff does not identify any allegation in the Second Amended Complaint asserting that he viewed prerecorded content through NFL+.  *See id.*  Instead, he argues that the Second Amended Complaint's allegation that he watched videos through NFL+, combined with the undisputed fact that NFL+ has prerecorded content, is sufficient to establish that he was a consumer of a "video tape service provider" for purposes of a motion to dismiss.  *See id.* at 10-12.

Even accepting the non-pleaded fact that NFL+ has prerecorded content (to which the parties nonetheless appear to agree), the Court agrees with Defendant that Plaintiff, by failing to plead that he viewed prerecorded video content through NFL+, has insufficiently alleged that he was a consumer of a "video tape service provider."  Although a plaintiff need not "allege the specific videos he watched to state a claim under the VPPA," *Frawley v. Nexstar Media Grp. Inc.*, No. 23-cv-02197, 2024 WL 3798073, at *6 (N.D. Tex. July 22, 2024), or "plead the circumstances of every alleged disclosure with particularity," *Campos v. Tubi, Inc.*, --- F. Supp. 3d ----, 2024 WL 496234, at *9 (N.D. Ill. Feb. 8, 2024), Plaintiff does not allege that he watched *any* prerecorded videos via NFL+ at all during the brief period where he was a subscriber to NFL+.  This failure is fatal to the Second Amended Complaint.  *See, e.g.*, *Solomon v. Flipps Media, Inc.*, No. 22-cv-05508 (JMA), 2023 WL 6390055, at *5 (E.D.N.Y. Sept. 30, 2023) (granting motion to dismiss where

plaintiff "never explicitly allege[d] that she actually accessed [any] 'prerecorded' video on

[d]efendant's site"); *Stark v. Patreon, Inc.*, 635 F. Supp. 3d 841, 851 (N.D. Cal. 2022) (granting

motion to dismiss where complaint "include[d] numerous references to 'videos' and 'video

content,' but d[id] not specify whether they were broadcast live or prerecorded and available on

demand," and "[n]othing in the complaint suggest[ed] an inference one way or the other on that

question"); *cf. Golden v. NBCUniversal Media, LLC*, 688 F. Supp. 3d 150, 157, 167 (S.D.N.Y.

2023) (denying motion to dismiss on this ground where plaintiff expressly alleged that she used her

subscription to view prerecorded videos, although granting dismissal on another ground);

*Czarnionka v. Epoch Times Ass'n*, No. 22-cv-06348 (AKH), 2022 WL 17069810, at *4 (S.D.N.Y.

Nov. 17, 2022) (denying motion to dismiss where plaintiff alleged that the website had prerecorded

videos, and where there was no indication that the website had any live videos).

### IV.    Class-Action Waiver

As noted, Plaintiff asserts a VPPA claim on behalf of not only himself but also a putative

class.  SAC ¶ 52.  Defendant contends that "[e]ven if the Court declines to dismiss the SAC in its

entirety, it should nevertheless dismiss the class claims with prejudice."  Br. at 23.

Where, as here, a named plaintiff's claim is dismissed prior to class certification, the Court

lacks jurisdiction over any putative class-action claims.  *See Martin v. New Am. Cinema Grp., Inc.*,

No. 22-cv-05982 (JLR), 2023 WL 2024672, at *9 (S.D.N.Y. Feb. 15, 2023) (collecting cases).

Thus, having dismissed Plaintiff's individual VPPA claim, the Court dismisses the putative VPPA

class-action claim without prejudice.  *See Miller v. Brightstar Asia, Inc.*, 43 F.4th 112, 126 (2d Cir.

2022) ("A dismissal for lack of jurisdiction must be without prejudice rather than with prejudice."

(citation omitted)).  The Court does not reach the parties' other arguments about the applicability of

the class-action waiver in Section 19 of the Agreement.

**CONCLUSION**

Plaintiff's request to stay is DENIED, Defendant's motion to dismiss under Rule 12(b)(1) is

DENIED, and Defendant's motion to dismiss under Rule 12(b)(6) is GRANTED.  The Clerk of

Court is respectfully directed to terminate the motion at Dkt. 82 and CLOSE the case.

Dated: September 5, 2024                           SO ORDERED.
      New York, New York

JENNIFER L. ROCHON
United States District Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------X
BRANDON HUGHES, individually and on behalf of
all others similarly situated,

                           Plaintiff,

       -against-                                   22 **CIVIL** 10743(JLR)

                                           **JUDGMENT**

NATIONAL FOOTBALL LEAGUE,

                         Defendant.
----------------------------------------------------------------X

          It is hereby **ORDERED, ADJUDGED AND DECREED:** That for the reasons

stated in the Court's Opinion and Order dated September 5, 2024, Plaintiff's request to stay is

DENIED, Defendant's motion to dismiss under Rule 12(b)(1) is DENIED, and Defendant's

motion to dismiss under Rule 12(b)(6) is GRANTED. Accordingly, the case is closed.

**Dated:** New York, New York

       September 6, 2024

                                        **DANIEL ORTIZ**
                                 **Acting Clerk of Court**

              **BY:**
                         _____
                                  **Deputy Clerk**

## 18 U.S. Code § 2710 - Wrongful disclosure of video tape rental or sale records

(a)Definitions.—For purposes of this section—

(1)the term "consumer" means any renter, purchaser, or subscriber of goods or services from a video tape service provider;

(2)the term "ordinary course of business" means only debt collection activities, order fulfillment, request processing, and the transfer of ownership;

(3)the term "personally identifiable information" includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider; and

(4)the term "video tape service provider" means any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials, or any person or other entity to whom a disclosure is made under subparagraph (D) or (E) of subsection (b)(2), but only with respect to the information contained in the disclosure.

(b)Video Tape Rental and Sale Records.—

(1)A video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider shall be liable to the aggrieved person for the relief provided in subsection (d).

(2)A video tape service provider may disclose personally identifiable information concerning any consumer—

(A)to the consumer;

(B)to any person with the informed, written consent (including through an electronic means using the Internet) of the consumer that—

(i)is in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer;

(ii)at the election of the consumer—

(I)is given at the time the disclosure is sought; or

(II)is given in advance for a set period of time, not to exceed 2 years or until consent is withdrawn by the consumer, whichever is sooner; and

(iii)the video tape service provider has provided an opportunity, in a clear and conspicuous manner, for the consumer to withdraw on a case-by-case basis or to withdraw from ongoing disclosures, at the consumer's election;

(C)to a law enforcement agency pursuant to a warrant issued under the Federal Rules of Criminal Procedure, an equivalent State warrant, a grand jury subpoena, or a court order;

(D)to any person if the disclosure is solely of the names and addresses of consumers and if—

(i)the video tape service provider has provided the consumer with the opportunity, in a clear and conspicuous manner, to prohibit such disclosure; and

(ii)the disclosure does not identify the title, description, or subject matter of any video tapes or other audio visual material; however, the subject matter of such materials may be disclosed if the disclosure is for the exclusive use of marketing goods and services directly to the consumer;

(E)to any person if the disclosure is incident to the ordinary course of business of the video tape service provider; or

(F)pursuant to a court order, in a civil proceeding upon a showing of compelling need for the information that cannot be accommodated by any other means, if—

(i)the consumer is given reasonable notice, by the person seeking the disclosure, of the court proceeding relevant to the issuance of the court order; and

(ii)the consumer is afforded the opportunity to appear and contest the claim of the person seeking the disclosure.

If an order is granted pursuant to subparagraph (C) or (F), the court shall impose appropriate safeguards against unauthorized disclosure.

(3)Court orders authorizing disclosure under subparagraph (C) shall issue only with prior notice to the consumer and only if the law enforcement agency shows that there is probable cause to believe that the records or other information sought are relevant to a legitimate law enforcement inquiry. In the case of a State government authority, such a court order shall not issue if prohibited by the law of such State. A court issuing an order pursuant to this section, on a motion made promptly by the video tape service provider, may quash or modify such order if the information or records requested are unreasonably voluminous in nature or if

compliance with such order otherwise would cause an unreasonable burden on such provider.

(c)Civil Action.—

(1)Any person aggrieved by any act of a person in violation of this section may bring a civil action in a United States district court.

(2)The court may award—

(A)actual damages but not less than liquidated damages in an amount of $2,500;

(B)punitive damages;

(C)reasonable attorneys' fees and other litigation costs reasonably incurred; and

(D)such other preliminary and equitable relief as the court determines to be appropriate.

(3)No action may be brought under this subsection unless such action is begun within 2 years from the date of the act complained of or the date of discovery.

(4)No liability shall result from lawful disclosure permitted by this section.

(d)Personally Identifiable Information.—

Personally identifiable information obtained in any manner other than as provided in this section shall not be received in evidence in any trial, hearing, arbitration, or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of the United States, a State, or a political subdivision of a State.

(e)Destruction of Old Records.—

A person subject to this section shall destroy personally identifiable information as soon as practicable, but no later than one year from the date the information is no longer necessary for the purpose for which it was collected and there are no pending requests or orders for access to such information under subsection (b)(2) or (c)(2) or pursuant to a court order.

(f)Preemption.—

The provisions of this section preempt only the provisions of State or local law that require disclosure prohibited by this section.

(Added Pub. L. 100–618, § 2(a)(2), Nov. 5, 1988, 102 Stat. 3195; amended Pub. L. 112–258, § 2, Jan. 10, 2013, 126 Stat. 2414.)