# 24-2656

## United States Court of Appeals
### *for the*
## Second Circuit
_____

BRANDON HUGHES, individually and on behalf of all others similarly situated,

*Plaintiff-Appellant*,

ISRAEL JAMES,

*Plaintiff,*

*v.*

NATIONAL FOOTBALL LEAGUE,

*Defendant-Appellee.*

_____

Appeal from the United States District Court for the Southern District of New York — No. 1:22-cv-10743-JLR — Hon. Jennifer L. Rochon, U.S. District Judge

_____

**BRIEF FOR DEFENDANT-APPELLEE NATIONAL FOOTBALL LEAGUE**
_____

Matthew X. Etchemendy
VINSON & ELKINS LLP
2200 Pennsylvania Avenue, NW
Suite 500 West
Washington, DC  20037
Phone: 202.639.6740
Email: metchemendy@velaw.com

Hilary L. Preston
Marisa Antonelli
VINSON & ELKINS LLP
1114 Avenue of the Americas
32nd Floor
New York, NY  10036
Phone: 212.237.0000
Email: hpreston@velaw.com
Email: mantonelli@velaw.com

*Counsel for National Football League*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 26.1, Defendant-Appellee National Football League ("NFL") makes the following disclosure:

The NFL is an unincorporated association of 32 member clubs that has no parent corporation(s), and no publicly held corporation owns 10% or more of its stock.

Date: February 10, 2025                Respectfully submitted,

                                       */s/ Hilary L. Preston*

Matthew X. Etchemendy               Hilary L. Preston
VINSON & ELKINS LLP                 Marisa Antonelli
2200 Pennsylvania Avenue, NW         VINSON & ELKINS LLP
Suite 500 West                      1114 Avenue of the Americas
Washington, DC  20037               32nd Floor
Phone: 202.639.6740                 New York, NY  10036
Email: metchemendy@velaw.com        Phone: 212.237.0000
                                    Email: hpreston@velaw.com
                                    Email: mantonelli@velaw.com

        *Counsel for National Football League*

i

# <u>TABLE OF CONTENTS</u>

**Page**

Corporate Disclosure Statement ................................................................. i

Table of Authorities ................................................................................... iv

Introduction .................................................................................................1

Counter-Statement of Jurisdiction .............................................................4

Statement of the Issues................................................................................5

Statement of the Case..................................................................................5

    I.     The VPPA ........................................................................................6

    II.    NFL.com and NFL+ .......................................................................8

    III.   Mr. Hughes's Allegations...............................................................10

    IV.   The NFL's Motion to Dismiss the Second Amended Complaint ............14

    V.    The District Court's Decision, and This Court's Decision in *Salazar*................................................................................................16

Summary of Argument ..............................................................................18

Argument....................................................................................................21

    I.     Standard of Review ........................................................................21

    II.    Mr. Hughes Lacks Article III Standing. ......................................22

    III.   The District Court Correctly Dismissed Mr. Hughes's Suit for Failure to State a Claim. ................................................................30

        A.    Mr. Hughes Failed to Plausibly Allege That the NFL "Knowingly Disclosed" His PII.......................................33

            1.    Mr. Hughes Failed to Plausibly Allege That the NFL "Disclosed" His PII...............................................34

            2.    Mr. Hughes Failed to Plausibly Allege That the NFL "Knowingly" Disclosed His PII...........................41

        B.    Mr. Hughes Failed to Plausibly Allege That Any PII About Him Was Disclosed........................................................43

            1.    Mr. Hughes Failed to Plausibly Allege That His Facebook Profile Contains Identifying Information.............43

2.      Mr. Hughes Failed to Plausibly Allege That
        Information About His Viewing of Prerecorded Videos
        Was Disclosed.......................................................................50

Conclusion ...........................................................................................57

Certificate of Compliance with Type-Volume Limit ............................58

Certificate of Service .............................................................................59

## <u>TABLE OF AUTHORITIES</u>

**Cases:**                                                               **Page(s)**

*Amidax Trading Grp. v. S.W.I.F.T. SCRL*,
671 F.3d 140 (2d Cir. 2011) ..............................................................28

*Anderson News, L.L.C. v. Am. Media, Inc.*,
680 F.3d 162 (2d Cir. 2012) ..............................................................33

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)..........................................................................21

*Atl. Diving Supply, Inc. v. Basnight*,
No. 22-cv-298, 2022 WL 5568083 (E.D. Va. Sept. 21, 2022)..........36

*Auburn Hous. Auth. v. Martinez*,
277 F.3d 138 (2d Cir. 2002) ..............................................................54

*Barclift v. Keystone Credit Servs., LLC*,
93 F.4th 136 (3d Cir. 2024) ...............................................................24

*Buechler v. Gannett Co., Inc.*,
No. 22-cv-1464, 2023 WL 6389447 (D. Del. Oct. 2, 2023) ..............35

*Burch v. Pioneer Credit Recovery, Inc.*,
551 F.3d 122 (2d Cir. 2008) ..............................................................56

*CBF Indústria de Gusa S/A v. AMCI Holdings, Inc.*,
850 F.3d 58 (2d Cir. 2017) ................................................ 21, 22, 32

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
511 U.S. 164 (1994)..........................................................................38

*Chutich v. Green Tree Acceptance, Inc.*,
No. 88-cv-869, 1993 WL 173813 (D. Minn. Apr. 19, 1993) .............37

*De Jesus v. Sears, Roebuck & Co., Inc.*,
87 F.3d 65 (2d Cir. 1996) ..................................................................33

*DiFolco v. MSNBC Cable L.L.C.*,
622 F.3d 104 (2d Cir. 2010) ..............................................................25

*DotStrategy Co. v. Facebook Inc.*,
No. 20-cv-170, 2020 WL 6591366 (N.D. Cal. Nov. 11, 2020)..........46

*E.E.O.C. v. Port Auth. of N.Y. & N.J.*,
768 F.3d 247 (2d Cir. 2014) .................................................... 55, 56

iv

**Cases—Continued:** Page(s)

*Edwards v. Learfield Commc'ns, LLC*,
697 F. Supp. 3d 1297 (N.D. Fla. 2023) ............................................................47

*Eichenberger v. ESPN, Inc.*,
876 F.3d 979 (9th Cir. 2017) ........................................................ 37, 44, 45, 49

*Ellis v. Cartoon Network, Inc.*,
803 F.3d 1251 (11th Cir. 2015) ................................................................6

*Fed. Hous. Fin. Agency v. UBS Americas Inc.*,
712 F.3d 136 (2d Cir. 2013) ............................................................54

*Force v. Facebook, Inc.*,
934 F.3d 53 (2d Cir. 2019) ............................................................26

*Gallop v. Cheney*,
642 F.3d 364 (2d Cir. 2011) ............................................................57

*Gardner v. MeTV*,
No. 22-cv-5963, 2024 WL 779728 (N.D. Ill. Feb. 15, 2024) ..............................3

*Ghanaat v. Numerade Labs, Inc.*,
689 F. Supp. 3d 714 (N.D. Cal. 2023) ............................................................47

*Heerde v. Learfield Commc'ns, LLC*,
No. 23-cv-4493, 2024 WL 3573874 (C.D. Cal. July 19, 2024) ........................47

*Hunstein v. Preferred Collection & Mgmt. Servs., Inc.*,
48 F.4th 1236 (11th Cir. 2022) ............................................................24

*In re Arab Bank, PLC Alien Tort Statute Litig.*,
808 F.3d 144 (2d Cir. 2015) ............................................................32

*In re Barnet*,
737 F.3d 238 (2d Cir. 2013) ............................................................53

*In re Guo*,
965 F.3d 96 (2d Cir. 2020) ............................................................31

*In re Hulu Priv. Litig.*,
86 F. Supp. 3d 1090 (N.D. Cal. 2015) ............................................................41

*In re Hulu Priv. Litig.*,
No. 11-cv-03764, 2014 WL 1724344 (N.D. Cal. Apr. 28, 2014) ....................41

*In re Hulu Priv. Litig.*,
No. 11-cv-3764, 2012 WL 3282960 (N.D. Cal. Aug. 10, 2012) ......................53

**Cases—Continued:** Page(s)

*In re Nickelodeon Consumer Priv. Litig.*,
827 F.3d 262 (3d Cir. 2016) ...................................................... *passim*

*In re Terrorist Attacks on Sept. 11, 2001*,
714 F.3d 109 (2d Cir. 2013) ................................................. 19, 32

*Kiobel v. Royal Dutch Petroleum Co.*,
621 F.3d 111 (2d Cir. 2010) ..........................................................29

*Kuzenski v. Uproxx LLC*,
No. 23-cv-945, 2023 WL 8251590 (C.D. Cal. Nov. 27, 2023) ...........................3

*Lamb v. Forbes Media LLC*,
No. 22-cv-6319, 2023 WL 6318033 (S.D.N.Y. Sept. 28, 2023) ........................3

*Louth v. NFL Enters. LLC*,
No. 21-cv-405, 2022 WL 4130866 (D.R.I. Sept. 12, 2022) ..............................50

*Meyer v. Uber Techs., Inc.*,
868 F.3d 66 (2d Cir. 2017) ............................................................25

*Mollett v. Netflix, Inc.*,
795 F.3d 1062 (9th Cir. 2015) .......................................... 40, 42, 45

*Nabozny v. Optio Sols. LLC*,
84 F.4th 731 (7th Cir. 2023) ...........................................................24

*Neal v. Town of E. Haven*,
694 F. App'x 44 (2d Cir. 2017) ......................................................47

*Salazar v. Nat'l Basketball Ass'n*,
118 F.4th 533 (2d Cir. 2024) .................................................. *passim*

*Salazar v. Nat'l Basketball Ass'n*,
685 F. Supp. 3d 232 (S.D.N.Y. 2023) ...................................... 13, 23

*Sellers v. Bleacher Rep., Inc.*,
No. 23-cv-368, 2023 WL 4850180 (N.D. Cal. July 28, 2023) ..........................50

*Shields v. Prof. Bureau of Collections of Md., Inc.*,
55 F.4th 823 (10th Cir. 2022) .........................................................24

*Smith v. Facebook, Inc.*,
262 F. Supp. 3d 943 (N.D. Cal. 2017) ...............................................36

*Smith v. Trinity Broad. of Tex., Inc.*,
No. 24-cv-1046, 2024 WL 4394557 (C.D. Cal. Sept. 27, 2024) .......................47

**Cases—Continued:**                                                 **Page(s)**

*Solomon v. Flipps Media, Inc.*,
  No. 22-cv-5508, 2023 WL 6390055 (E.D.N.Y. Sept. 30, 2023) ................ 47, 50

*Sonterra Cap. Master Fund Ltd. v. UBS AG*,
  954 F.3d 529 (2d Cir. 2020) ................................................. 22

*Stark v. Patreon, Inc.*,
  635 F. Supp. 3d 841 (N.D. Cal. 2022) .................................... 50, 56

*Tannerite Sports, LLC v. NBCUniversal News Grp.*,
  864 F.3d 236 (2d Cir. 2017) ............................................... 57

*TransUnion LLC v. Ramirez*,
  141 S. Ct. 2190 (2021) ................................................ *passim*

*United States ex rel. Keshner v. Nursing Personnel Home Care*,
  794 F.3d 232 (2d Cir. 2015) ............................................... 52

*United States v. Sylvester*,
  605 F.2d 474 (9th Cir. 1979) .............................................. 37

*Williams v. Citigroup Inc.*,
  659 F.3d 208 (2d Cir. 2011) ............................................... 57

*Wilson v. Triller*,
  598 F. Supp. 3d 82 (S.D.N.Y. 2022) ....................................... 47

*Yershov v. Gannett Satellite Info. Network, Inc.*,
  820 F.3d 482 (1st Cir. 2016) ......................................... 44, 48, 49

*Zuni Pub. Sch. Dist. No. 89 v. Dep't of Educ.*,
  550 U.S. 81 (2007) ....................................................... 39

**Statutes:**

10 U.S.C. § 949p-5 ........................................................ 38

15 U.S.C. § 6821 ......................................................... 38

18 U.S.C. § 2710 .......................................................... 1

18 U.S.C. § 2710(a)(1) ............................................ 6, 14, 30, 31

18 U.S.C. § 2710(a)(3) ............................................... *passim*

18 U.S.C. § 2710(a)(4) ............................................... *passim*

18 U.S.C. § 2710(b) ...................................................... 54

18 U.S.C. § 2710(b)(1) ............................................... *passim*

**Statutes—Continued:**                                     **Page(s)**

18 U.S.C. § 2710(b)(2)(B) ...................................................................29

18 U.S.C. § 2710(c)(1) .......................................................................42

18 U.S.C. § 2710(c)(2) .........................................................................2

18 U.S.C. § 2710(c)(2)(A) ....................................................................7

18 U.S.C. App. 3 § 5 ..........................................................................38

28 U.S.C. § 1291 .................................................................................4

28 U.S.C. § 1331 .................................................................................4

**Other Authorities:**

134 Cong. Rec. 31,070 (1988) .............................................................6

Am. Class Action Compl., *Joiner v. NHL Enters., Inc.*,
    No. 23-cv-2083 (S.D.N.Y. Nov. 13, 2024) ......................................46

Appl. for Extension of Time to File Pet. for Writ of Certiorari,
    *Nat'l Basketball Ass'n v. Salazar*, No. 24A629 (U.S. Dec. 23, 2024) ................4

Br. for Def.-Appellee, *Salazar v. Nat'l Basketball Ass'n*,
    No. 23-1147 (2d Cir. Dec. 5, 2023) ..................................................31

*Cookies & Other Storage Technology*, Facebook.com (policy as in effect
    Dec. 31, 2019), *available at*
    https://web.archive.org/web/20191231065306/https://www.facebook.com/
    policies/cookies/...........................................................................26

*Cookies Policy*, Facebook.com,
    https://www.facebook.com/privacy/policies/cookies/ ............................... 11, 26

David A. Elder, *Privacy Torts* § 3:9 (Dec. 2024 Update) ......................................24

*NFL Game Highlights*, NFL.com,
    https://www.nfl.com/videos/channel/game-highlights-vc..................................8

*NFL+: Learn More*, NFL.com, https://www.nfl.com/plus/learn-more....................8

Restatement (Second) of Torts § 652D & cmt. a (Am. L. Inst. 1977) ...................23

Restatement (Second) of Torts § 652F cmt. b (Am. Law Inst. 1977) ...................24

S. Rep. No. 100-599 (1988) ...............................................................6, 53

William L. Prosser, *Privacy*,
    48 Calif. L. Rev. 383 (1960)..........................................................24

## INTRODUCTION

This case is part of a wave of abusive class-action litigation under the Video Privacy Protection Act ("VPPA"). The VPPA—whose enactment was impelled by the widely publicized disclosure of Judge Robert Bork's video-tape rental records—forbids "video tape service provider[s]" from "knowingly disclos[ing]" "personally identifiable information" about specific videos requested or obtained by their "consumers." 18 U.S.C. § 2710. Its purpose was to prevent disclosures akin to the one that motivated its passage: a video-store employee handing over video rental records to a journalist trying to snoop and publish a story on a customer's video-renting history, presumably in hopes of publicly embarrassing him.

Plaintiff-Appellant Brandon Hughes's lawsuit involves a very different set of facts. He seeks to impose potentially enormous liability based on vague and evolving allegations that: (i) he viewed unspecified "Video Media" on the NFL's website, and (ii) code created by Meta Platforms, Inc. ("Facebook")—the Facebook Pixel—that was installed on the NFL's website allegedly caused Mr. Hughes's own device to send information about his browsing activity to Facebook, so Facebook could serve more targeted advertisements to him. All of these alleged disclosures resulted from the fact that Mr. Hughes signed up for an account with Facebook, which (pursuant to its own user policies) places cookies on its account holders' browsers that enable Facebook to track their browsing activity on third-party

1

websites.  The gravamen of Mr. Hughes's lawsuit is that the NFL, by installing the Pixel on its website and thereby allegedly enabling Mr. Hughes's browser to share information with Facebook, is liable for potentially significant monetary penalties for supposedly violating the VPPA—notwithstanding the fact that Mr. Hughes and other Facebook users could easily prevent their browsers from making such Pixel-related disclosures at any time.

Mr. Hughes's lawsuit is not unique.  Plaintiffs' firms have filed *dozens* of now-pending VPPA cases (as well as made countless mass arbitration demands) throughout the country against a wide range of defendants, pressing substantially identical claims involving numerous websites that allegedly installed Facebook's Pixel.  Given the ubiquity of video on the modern Internet, the lawsuits have targeted practically every kind of business—including media and entertainment companies, health websites, bookstores, restaurants, breakfast cereal manufacturers, museums, universities, and (as here) sports leagues.  Notably absent from these cases is any allegation that the plaintiffs were actually harmed, or even psychologically upset, by the alleged disclosures.  Rather, they simply seek to leverage the VPPA's $2,500 "liquidated damages" provision to secure a class-action payday.  *See* 18 U.S.C. § 2710(c)(2).

2

By the NFL's count, this case is one of at least *six* VPPA appeals filed in this Court within the last year and a half, all involving the Facebook Pixel.[1] Here, the District Court dismissed Mr. Hughes's lawsuit for failure to adequately allege that he was a protected "consumer" within the VPPA's meaning—a holding consistent with numerous other district court decisions across the country.[2] Shortly after this appeal was filed, however, this Court issued its first and, to date, only decision addressing the VPPA: *Salazar v. National Basketball Association*, 118 F.4th 533 (2d Cir. 2024). There, this Court held that a similar VPPA complaint adequately alleged "consumer" status—albeit while carefully noting that its "narrow" ruling did not speak to potential alternative grounds for dismissal. *Id.* at 553. The basic thrust of Mr. Hughes's brief is that *Salazar* is dispositive, and this Court should accordingly vacate the decision below and remand so the District Court can consider

---

[1] *See Golden v. NBCUniversal Media, LLC*, No. 24-2649 (2d Cir.) (dismissed and remanded Jan. 3, 2025); *McCausland v. Gray Media Grp., Inc.*, No. 24-1266 (2d Cir.) (dismissed Aug. 19, 2024); *Solomon v. Flipps Media, Inc.*, No. 23-7597 (2d Cir.) (argued May 13, 2024); *Alex v. NFL Enters., LLC*, No. 23-7455 (2d Cir.) (docketed Oct. 23, 2023); *Salazar v. Nat'l Basketball Ass'n*, 118 F.4th 533 (2d Cir. 2024). Numerous cases are also pending in other courts of appeals. *E.g.*, *Salazar v. Paramount Glob.*, No. 23-5748 (6th Cir.) (argued June 18, 2024).

[2] *See, e.g.*, *Kuzenski v. Uproxx LLC*, No. 23-cv-945, 2023 WL 8251590, at *5 (C.D. Cal. Nov. 27, 2023); *Lamb v. Forbes Media LLC*, No. 22-cv-6319, 2023 WL 6318033, at *13 (S.D.N.Y. Sept. 28, 2023); *Gardner v. MeTV*, No. 22-cv-5963, 2024 WL 779728, at *2 (N.D. Ill. Feb. 15, 2024), *appeal pending*, No. 24-1290 (7th Cir.) (argued Sept. 13, 2024).

the NFL's alternative arguments for dismissal in the first instance. *See* Hughes Br. 3.[3]

Mr. Hughes is wrong. Setting aside that the NFL respectfully disagrees with this Court's rulings in *Salazar* (issues the NFL reserves the right, as necessary, to pursue through *en banc* rehearing or in the Supreme Court), Mr. Hughes's lawsuit is fatally flawed for numerous reasons *Salazar* does not control. Mr. Hughes lacks standing on grounds *Salazar* did not consider or address. Additionally, he did not plausibly allege that the NFL "disclose[d]" information about him to Facebook, much less "knowingly" so. 18 U.S.C. § 2710(b)(1). Moreover, he did not plausibly allege that any disclosures to Facebook contained "personally identifiable information" within the VPPA's meaning. *Id.* § 2710(a)(3), (b)(1). This Court unquestionably has authority to affirm on these alternative bases, and it should do so—thereby preserving judicial and party resources by putting Mr. Hughes's meritless lawsuit to rest.

## COUNTER-STATEMENT OF JURISDICTION

The District Court had statutory jurisdiction under 28 U.S.C. § 1331, and this Court has statutory jurisdiction under 28 U.S.C. § 1291. However, the NFL maintains that Mr. Hughes lacks Article III standing. *See infra*, Argument, Part II.

---

[3] *Salazar* may well be headed to the Supreme Court, given that it created at least one circuit split. *See generally* Appl. for Extension of Time to File Pet. for Writ of Certiorari, *Nat'l Basketball Ass'n v. Salazar*, No. 24A629 (U.S. Dec. 23, 2024).

## STATEMENT OF THE ISSUES

The issues before the Court are:

1.      Whether Mr. Hughes has Article III standing.

2.      Whether the District Court properly dismissed Mr. Hughes's complaint for failure to plausibly allege that he is a protected VPPA "consumer."[4]

3.      Whether the District Court's decision should be affirmed on the alternative basis that Mr. Hughes failed to plausibly allege that the NFL "knowingly disclosed" personally identifiable information.

4.      Whether the District Court's decision should be affirmed on the alternative basis that Mr. Hughes failed to plausibly allege that "personally identifiable information" about him was disclosed.

## STATEMENT OF THE CASE

Mr. Hughes appeals from a decision by the U.S. District Court for the Southern District of New York (Rochon, J.) granting the NFL's motion to dismiss Mr. Hughes's Second Amended Complaint raising claims against the NFL under the VPPA.  The District Court's opinion is available at 2024 WL 4063740.  *See* SA.1-12.

---

[4] For clarity, the NFL concedes that the answer to this question, under intervening Circuit precedent, is "no."  *See infra* pp. 30-31.  However, the NFL may seek further review of the issue before the *en banc* Court or the Supreme Court.

## I.     The VPPA

The VPPA was enacted in 1988 in response to a specific privacy violation involving Judge Robert H. Bork.  After Judge Bork was nominated to the Supreme Court, a newspaper reporter persuaded a video store clerk to hand over Judge Bork's video rental history.  S. Rep. No. 100-599, at 5 (1988).  The newspaper then published an article (entitled "The Bork Tapes") containing the titles of 146 films he and his family had rented from the store.  *Id.*; *Ellis v. Cartoon Network, Inc.*, 803 F.3d 1251, 1252 (11th Cir. 2015).  Impelled by widespread shock over this public disclosure, Congress enacted the VPPA to prevent, in the words of one of the law's cosponsors, "outrageous invasion[s] of privacy" akin to what happened to Judge Bork.  134 Cong. Rec. 31,070 (1988) (statement of Sen. Grassley).

The VPPA is narrowly drawn in several respects.  For instance, the statute's protections extend only to "consumer[s]," defined as "renter[s], purchaser[s], or subscriber[s] of goods or services from a video tape service provider."  18 U.S.C. § 2710(a)(1).  And its liability provision covers only "knowing[] disclos[ures]" by "video tape service provider[s]," *id.* § 2710(b)(1), defined as entities "engaged in the business . . . of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials."  *Id.* § 2710(a)(4).

As to the type of content it reaches, the VPPA applies exclusively to disclosures of video content—not non-video-related transactions or disclosures (e.g.,

6

those involving books or music). *See* 18 U.S.C. § 2710(a)(3); *accord Salazar*, 118 F.4th at 549 n.10. And even then, the VPPA is concerned only with a subset of audiovisual content: namely, "*prerecorded* video cassette tapes" or similar materials, not live TV or the like. *See* 18 U.S.C. § 2710(a)(4) (emphasis added). Finally, it forbids only the knowing disclosure of "personally identifying" information regarding consumers' video-related activities—it does not regulate disclosures that would not reveal the identities of specific individuals and the "specific video materials or services" they requested or obtained. *Id.* § 2710(a)(3).

In short, the VPPA is not a broad privacy charter, but a narrow statute focused on disclosures akin to the one that motivated its passage—i.e., instances where a "video tape service provider" who offers "prerecorded video cassette tapes" or similar materials (akin to the video rental store Judge Bork frequented) "knowingly discloses" (akin to the store employee's willing decision to hand over Judge Bork's records to a journalist) "personally identifiable information" regarding the "specific video materials" an individual accessed (akin to the list of 146 tapes Judge Bork rented). For this reason, the VPPA remained a relatively obscure statute for much of its history. However, it does contain one very important clause that has made it a fatefully attractive vehicle for class-action lawsuits: a $2,500 "liquidated damages" provision. 18 U.S.C. § 2710(c)(2)(A). The prospect of securing such statutory damages for potentially enormous volumes of Internet users without needing to

7

prove real-world harm has—as described further below—led to its use as a class-action lawsuit mill, particularly in recent years as plaintiffs' lawyers have attempted to apply the VPPA's restrictions to routine backend data transactions on the Internet.

## II.  NFL.com and NFL+

The NFL operates a football league comprising 32 member teams.  The NFL's website, NFL.com, and the NFL's mobile App, feature a broad selection of content such as digital news, league standings, and team updates.  NFL.com features a range of free video offerings, such as game highlight compilations.  *See, e.g.*, *NFL Game Highlights*, NFL.com, https://www.nfl.com/videos/channel/game-highlights-vc (last visited Feb. 8, 2025).  At times relevant here, website visitors could also sign up for free NFL email newsletters by creating an account on NFL.com, which involves submitting basic information, such as their name and email address.  *See* JA.265 (¶ 20); *cf.* JA.285-86.

The NFL also offers a product called NFL+, an exclusive paid streaming platform providing subscribers a mix of live and prerecorded video content.  That content includes, among other things, live games and past games available on demand.  *See* JA.352, 365 (describing NFL+); *see also* JA.288 (screenshot of NFL+ Premium sign-up link); *cf.* *NFL+: Learn More*, NFL.com, https://www.nfl.com/plus/learn-more (last visited Feb. 8, 2025).  A user who already

has an NFL.com account can also sign up for NFL+ using that account. *See* JA.285-86 (stating "One Account is All You Need" next to NFL and NFL+ logos).

NFL.com includes Terms and Conditions governing visitors' use of the site. *See* JA.301-23. The website also includes a detailed Privacy Policy outlining the NFL's data collection, usage, and sharing practices. *See* JA.325-341. The Privacy Policy discloses that using NFL.com may result in collection of users' data, including "[p]ages you view and links you click on within the Services." JA.268 (¶ 27); *see also* JA.327. Section 3 of the Privacy Policy, entitled "Sharing of Information," explains that users' personal data may be shared with third parties for advertising purposes and that these third parties "may set their own cookies or similar web technologies to collect information about users' online activities." JA.328-29. The Privacy Policy elsewhere notes that "social networking services may be able to collect information about you, including your activity on our Services." JA.332.

Users consent to the NFL's Terms and Conditions and its Privacy Policy when creating an account on NFL.com. On the account registration page, a disclaimer above the "Create Account" button informs the user that he or she agrees to the NFL's "Terms of Service" and "Privacy Policy" by creating an account. JA.285-86. Each of these phrases are presented in bold blue text and hyperlink to the relevant policies. *Id.*

9

### III.   Mr. Hughes's Allegations

This case began with a complaint filed against the NFL in the U.S. District Court for the Northern District of Illinois on behalf of a plaintiff named Israel James. *See* Compl., Dist. Ct. Dkt. 1 (Sept. 14, 2022). The case was transferred to the Southern District of New York, and plaintiff's counsel filed a First Amended Complaint substituting Mr. Hughes as named plaintiff (but otherwise containing no meaningful changes from Mr. James's complaint). *See* JA.14-33. The complaint was based on a template Mr. Hughes's counsel filed against numerous defendants across the country at around the same time.

Mr. Hughes's complaint alleged that the NFL violated the VPPA by disclosing personally identifiable information ("PII") about his video-browsing activities on NFL.com. More specifically, he alleged that he watched unspecified NFL "Video Media," and that the URLs of the NFL.com pages he visited were disclosed to Facebook, along with his "Facebook ID" or "FID"—a numerical identifier Facebook assigns to each of its account holders that is embedded in a cookie Facebook places on its account holders' browsers. JA.261, 270 (¶¶ 4-5, 35).[5] These alleged "disclosures" were enabled by the "Facebook Pixel" (now also known

---

[5] For ease of reference, the citations herein refer to the relevant paragraphs in the Second Amended Complaint. However, the allegations described herein, save the NFL+-related allegations described below, were also contained in the First Amended Complaint.

as the "Meta Pixel"), a widely utilized web-analytics tool offered by Facebook that helps website owners measure the effectiveness of their Facebook ad campaigns by understanding how Facebook users interact with their websites. JA.269-70 (¶¶ 32-33). The FID—stored in the cookie placed by Facebook on Mr. Hughes's browser—is the only identifying information Mr. Hughes alleged was transmitted to Facebook. *Cf.* JA.261 (¶ 5). The complaint contains no allegation that Mr. Hughes did not give consent to Facebook to place this "FID cookie." Nor did it allege the NFL disclosed any information it collected when Mr. Hughes registered for a newsletter, such as his name, date of birth, and IP address. *See* JA.265 (¶ 20). Mr. Hughes's complaint also contains no allegations at all regarding the specific nature of the "Video Media" he allegedly watched. *See* JA.262-63, 275 (¶¶ 12, 49).

As explained in the complaint, a Facebook user's FID is stored on an "FID cookie[] on their browser," JA.270 (¶ 35), i.e., on the user's own computer.[6] This cookie is placed on a Facebook user's browser by Facebook. *See* JA.263 (¶ 12) (emphasizing that alleged disclosures occurred when Mr. Hughes visited NFL.com while "logged into his Facebook account"); *cf. Cookies Policy*, Facebook.com, https://www.facebook.com/privacy/policies/cookies/ (last visited Feb. 8, 2025)

---

[6] A "cookie" is "a small file or part of a file that is stored on the computer of a World Wide Web user, that is created and subsequently read by a website server, and that contains personal user information (such as a user identification code, customized preferences, or a record of pages visited)." *Salazar*, 118 F.4th at 538 (citation omitted).

11

(Facebook Cookies Policy informing users that it "place[s] cookies on your computer or device and receive[s] information stored in cookies when you use or visit" third-party "websites and apps" that "incorporate Meta technologies"). According to the complaint, the FID cookie enables "the user's browser" to "transmit[] to Facebook" the user's FID and browsing information when the user visits sites with Facebook Pixel code installed. JA.270 (¶ 35). Although Mr. Hughes alleged that the installation of Facebook Pixel code on NFL.com "causes" the transmission of PII to Facebook "by the user's browser," *id.*, he nowhere alleged that the NFL itself possessed or had access to his FID. JA.271 (¶ 38) (alleging "database" of certain information maintained by the NFL, without mention of FIDs). And Mr. Hughes admitted that the relevant "communication[s] . . . to Facebook" were "sent from [his] device," not the NFL. JA.273 (¶ 42) (caption).

Mr. Hughes also alleged that he "register[ed] for NFL.com and "sign[ed] up for an online newsletter." JA.265 (¶ 20). Despite boilerplate allegations that he did not consent to disclosures to Facebook, Mr. Hughes did not deny that he agreed to the NFL's Terms and Conditions and Privacy Policy when registering for NFL.com, nor did he deny his agreement to Facebook's own privacy policies, acknowledging that he was a Facebook account holder and user.

As to any injuries or harm stemming from the alleged data transmissions to Facebook, the complaint is silent. Instead, Mr. Hughes asserted without elaboration

12

that the NFL, by installing Facebook's Pixel, "violated [his] . . . statutorily protected right to privacy" and caused an unspecified "loss of privacy." JA.279 (¶¶ 69-70). Mr. Hughes did so without any allegations that any information allegedly disclosed was ever made public or even viewed by a single human being; that the information was false, misleading, or reputationally damaging in any way; or that he experienced any upset or embarrassment, let alone financial loss. Indeed, Mr. Hughes alleges only that the information was transmitted to one entity, Facebook—an entity with which Mr. Hughes admittedly and voluntarily holds an account and which pursuant to its own policies places cookies on its account holders' browsers to enable those transmissions. As previously noted, there are no allegations in the complaint that Mr. Hughes did not consent to Facebook's placement of cookies on his browser, or that he ever took steps to remove such cookies.

The NFL moved to dismiss the First Amended Complaint on several grounds, including that Mr. Hughes failed to plausibly allege protected "consumer" status under the VPPA. While the NFL's motion was pending, Judge Rochon (the same District Judge assigned to this case) issued an opinion in *Salazar v. National Basketball Association*, 685 F. Supp. 3d 232 (S.D.N.Y. 2023), *rev'd*, 118 F.4th 533 (2d Cir. 2024), holding that the plaintiff in a similar case brought against the NBA did not plausibly allege VPPA consumer status based on allegations that he signed up for an email newsletter on NBA.com. Judge Rochon reasoned that signing up for

13

an email newsletter was insufficient to establish that the plaintiff "subscribe[d]" to "goods or services from a video tape service provider" within the statute's meaning, because he did not subscribe to audiovisual materials. 18 U.S.C. § 2710(a)(1).

Recognizing that his VPPA consumer status—and thus his lawsuit—was severely jeopardized by the District Court's decision in *Salazar*, Mr. Hughes rushed to amend his complaint. *See* JA.175-177. The Second Amended Complaint—which the District Court granted Mr. Hughes leave to file—included various marginal changes, but was primarily aimed at shoring up Mr. Hughes's "consumer" status by adding allegations that Mr. Hughes also had subscribed to NFL+, the premium streaming service described above. JA.274 (¶ 48); *accord* Hughes Br. 8-9 (similarly describing changes from First to Second Amended Complaint). Mr. Hughes was again silent as to the nature of the "Video Media" he watched, save that at least "[s]ome" was exclusive to NFL+. JA.275 (¶ 49).

## IV. The NFL's Motion to Dismiss the Second Amended Complaint

The NFL moved to dismiss Mr. Hughes's Second Amended Complaint. JA.342-73. First, the NFL argued that Mr. Hughes lacked Article III standing because the limited disclosures alleged did not amount to a legally cognizable injury with a "close relationship" to harms "traditionally recognized" as providing a basis for suit, as required under *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021). JA.358-360. The NFL also argued that a disclosure that is consented to is

not a traditionally recognized harm under *TransUnion*, and that Mr. Hughes failed to plausibly allege that he did not consent to the alleged disclosures by agreeing to Facebook's user policies and the NFL's Privacy Policy. JA.360. Second, the NFL argued that Mr. Hughes did not plausibly allege that he was a protected "consumer" under the VPPA. JA.360-67. The NFL's position was that Mr. Hughes was not a consumer by virtue of having signed up to receive an NFL.com newsletter because that was not a subscription to audiovisual materials under the District Court's prior opinion in *Salazar*. And Mr. Hughes's alleged subscription to NFL+ was also insufficient to render him a "consumer" vis-à-vis the disclosures at issue because, among other things, he did not allege he used his NFL+ subscription to watch any prerecorded video content, which is the only material within the statute's scope. 18 U.S.C. § 2710(a)(4).

Third, the NFL argued that Mr. Hughes failed to plausibly allege that his FID (together with his video-viewing history) constituted "personally identifying" information, since the complaint did not allege Mr. Hughes's Facebook profile contained identifying information about him. JA.367-69. Fourth, the NFL argued that Mr. Hughes did not plausibly allege that the NFL "knowingly disclosed" his PII because the complaint itself showed that the transfer of Mr. Hughes's FID came from his own browser, not the NFL. JA.369-71.

15

In opposition, Mr. Hughes argued that he had Article III standing based on intangible injury to his privacy. JA.385-89. As to his "consumer" status, Mr. Hughes argued that even if the District Court's opinion in *Salazar* was correct, he still qualified as a consumer based on his alleged subscription to NFL+ because that subscription provided Mr. Hughes the ability to access exclusive prerecorded content (although, curiously, he never disputed that he failed to allege *actually accessing* any such prerecorded content). JA.389-92. In response to the NFL's argument that it did not "knowingly disclose" his PII, Mr. Hughes did not contend that the NFL actually possessed the PII at issue, or dispute that the disclosures came from his own computer. But Mr. Hughes argued that the NFL nevertheless "disclosed" his PII by installing the Facebook Pixel on NFL.com—thus "permitting" his PII "to be transmitted" to Facebook by his browser. JA.392-93 (citation omitted). Mr. Hughes did not address his failure to allege that his Facebook profile contained any identifying information, and nowhere did he request leave to amend his complaint further if the District Court granted the NFL's motion to dismiss.

## V. The District Court's Decision, and This Court's Decision in *Salazar*

The District Court granted the NFL's motion to dismiss. SA.1-12. It first held that Mr. Hughes plausibly alleged an injury sufficient to confer standing— largely in reliance on its prior opinion in *Salazar*, which had likewise upheld the plaintiff's Article III standing. The District Court did, however, address one point

that "was not raised in *Salazar*": namely, the NFL's argument that Mr. Hughes lacked standing under *TransUnion* because he had failed to plausibly allege that he did not consent to the alleged disclosures by agreeing to Facebook's policies and the NFL's Privacy Policy. SA.7. The District Court rejected this argument as well, concluding that even if Mr. Hughes consented to the disclosures (and, as the NFL argued, therefore could not have suffered any legally cognizable injury), that would only support an affirmative defense, so Mr. Hughes had standing to assert his claim at least "at this juncture." SA.8.

Turning to the merits of Mr. Hughes's VPPA claim, however, the District Court dismissed the complaint on grounds that (1) Mr. Hughes's alleged status as an NFL email recipient did not render him a VPPA "consumer" (i.e., the same holding from its prior ruling in *Salazar*); and (2) his alleged subscription to NFL+ did not render him a protected "consumer" of a "video tape service provider" with respect to the disclosures at issue either, since he conceded that the VPPA applies only to prerecorded (as opposed to live) video content but failed to plead that he viewed any prerecorded content through NFL+. SA.9-11. Finding those issues dispositive, the District Court declined to address the NFL's other arguments. JA.367; SA.9. The District Court did not invite further amendment, SA.12, understandably, given the two prior amendment opportunities already afforded and the fact that Mr. Hughes never requested leave to amend further.

17

This appeal followed. After Mr. Hughes's appeal was docketed, this Court decided the appeal in *Salazar*, determining that the plaintiff in that case had Article III standing to pursue a VPPA claim based on alleged disclosures to Facebook via the Pixel technology, 118 F.4th at 540-44, that "consumer" status under the VPPA does not require a connection between the "goods or services" allegedly subscribed to and the types of content "video tape service providers" are defined as providing, and that signing up for an email newsletter is a sufficient basis for "consumer" status, *id.* at 544-53.

## SUMMARY OF ARGUMENT

On appeal, Mr. Hughes's argument boils down to a single talking point: that the intervening authority of *Salazar* requires this Court to vacate and remand. To be sure, *Salazar* undoubtedly affects this case in a significant way. The District Court dismissed Mr. Hughes's complaint based on the statutory interpretation it had adopted in *Salazar*, in accordance with which the District Court held that Mr. Hughes was not a protected VPPA "consumer." This Court's appellate decision in *Salazar* foreclosed the statutory interpretation upon which the District Court's reasoning was based. Thus, unless and until this Court's decision in *Salazar* is overruled or otherwise superseded, the District Court's *specific rationale* for dismissal is foreclosed.

But *Salazar* does not prevent this Court from upholding the dismissal on alternative grounds. There are several fatal flaws in Mr. Hughes's lawsuit that are unaffected by *Salazar*. And this Court is "free to affirm a decision on any grounds supported in the record, even if it is not one on which the trial court relied." *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 109, 114 (2d Cir. 2013) (citation omitted).

To begin, Mr. Hughes lacks Article III standing. Although *Salazar* upheld a VPPA plaintiff's standing in a similar case, the NFL raised additional grounds to conclude that Mr. Hughes lacks standing, which were "not raised in *Salazar*" (SA.7) and were not addressed by the appellate decision in that case. Specifically, as the NFL explained, Mr. Hughes failed to plausibly allege that he did not consent to the disclosures at issue—a fatal deficiency that breaks any analogy between Mr. Hughes's supposed injury and any harm "traditionally recognized as providing a basis for lawsuits in American courts." *TransUnion*, 141 S. Ct. at 2204. Mr. Hughes subscribed to an email newsletter on NFL.com and to NFL+, and was a Facebook account holder. And both the NFL and Facebook have terms and policies that inform users of the relevant disclosures. At common law, plaintiffs had no privacy interest in preventing disclosures to which they consented. Therefore, Mr. Hughes lacks standing. Nor does *Salazar* bind this Court to reach a different conclusion, because

these grounds for holding that Mr. Hughes lacks standing were not addressed in that case.

But even if this Court were to find that Mr. Hughes has standing, the District Court correctly dismissed his case for failure to state a claim. First, as the NFL explained below, Mr. Hughes failed to plausibly allege that *the NFL* disclosed PII about his video-related activities to Facebook, much less that it did so "knowingly." 18 U.S.C. § 2710(b)(1). On the contrary, Mr. Hughes's *own complaint* acknowledged that the disclosure of his FID—the only allegedly identifying information at issue—came from his own device and the cookie installed there by Facebook; as alleged, the disclosure was not made by the NFL. At best, Mr. Hughes alleged that the NFL, by installing Facebook Pixel code on its website, was a contributing *cause* to the disclosure made by his browser. But Congress knows how to prohibit "causing," or playing a role in causing, information "to be disclosed"— and in the VPPA, it did not. Mr. Hughes's attempt to read the VPPA more broadly, so as to hold third-party website owners like the NFL responsible for disclosures *his* device made to Facebook due to *his* participation in a Facebook tracking program cannot be sustained.

Second, Mr. Hughes failed to plausibly allege that any disclosures of PII occurred at all. Under the VPPA, personally identifiable information must (1) "personally" identify an individual, and (2) identify "specific video materials or

20

services" that person requested or obtained. 18 U.S.C. § 2710(a)(3); *accord Salazar*, 118 F.4th at 549. Both aspects are critical, and Mr. Hughes failed to plausibly allege either one. He did not plausibly allege that the transmissions of his FID to Facebook personally identified him because he did not allege that his Facebook profile, in turn, contained identifying information. And he did not plausibly allege that the transmissions to Facebook identified "specific video materials or services" within the statute's ambit, because he did not allege that he watched any *prerecorded* NFL video content—the only type of content the statute protects from disclosure.

## ARGUMENT

### I.  Standard of Review

This Court reviews *de novo* the grant of a motion to dismiss for failure to state a claim. *CBF Indústria de Gusa S/A v. AMCI Holdings, Inc.*, 850 F.3d 58, 77 (2d Cir. 2017). A complaint must be dismissed if it lacks "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). Conclusory allegations are not entitled to the presumption of truth on a motion to dismiss, and a plaintiff "armed with nothing more than conclusions," "labels," or "[t]hreadbare recitals of the elements of a cause of action" fails to state a claim. *Id.* at 678-81 (citation omitted). This Court "may affirm [a district court's decision] on any grounds for which there is a record sufficient to permit conclusions of law, including

grounds not relied upon by the district court." *CBF Indústria*, 850 F.3d at 78 (citation omitted). The Court also reviews *de novo* a facial challenge to Article III standing, i.e., one based (as here) on "the allegations of the complaint," "exhibits attached to it," and/or documents "incorporated" into the complaint via "cit[ation]" therein. *Sonterra Cap. Master Fund Ltd. v. UBS AG*, 954 F.3d 529, 533 & n.5 (2d Cir. 2020) (citation omitted). "The complaining party bears the burden of alleging facts that affirmatively and plausibly suggest that it has standing to sue." *CBF Indústria*, 850 F.3d at 77 (internal quotation marks omitted).

## II. Mr. Hughes Lacks Article III Standing.

Mr. Hughes has the burden to demonstrate Article III standing, *see TransUnion*, 141 S. Ct. at 2207, and he has failed to carry that burden. To be sure, the NFL recognizes that this Court recently upheld a plaintiff's standing to pursue a similar VPPA claim in *Salazar*. Nevertheless, the NFL respectfully contends that Mr. Hughes lacks standing, and explains below why *Salazar* is distinguishable.

To show standing, Mr. Hughes was required—first and foremost—to plausibly allege an injury in fact: i.e., either (1) a tangible harm (generally physical or monetary), or an "intangible harm[]" that has "a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts." *TransUnion*, 141 S. Ct. at 2204. Mr. Hughes claims no physical or monetary harm and thus must identify "a close historical or common-law analogue" for his asserted

22

intangible injury. *Id.* As the party invoking federal jurisdiction, this was—and remains—Mr. Hughes's burden to establish. *Id.* at 2207.

The common-law analogue on which Mr. Hughes relies, and on which *Salazar* relied to uphold standing in a similar VPPA case, is the tort of public disclosure of private facts. Hughes Br. 19-20; *see Salazar*, 118 F.4th at 541. The NFL agrees that that is the closest common-law analogue available to Mr. Hughes. But, on this record, the relationship between Mr. Hughes's allegations and the harms recognized by the common-law public-disclosure tort are not close enough to satisfy *TransUnion*.[7] As an initial matter, Mr. Hughes alleges only that his PII was disclosed to Facebook, and does not allege any "public disclosure"—i.e., disclosure to the general public, as the public-disclosure tort traditionally requires, *cf.* Restatement (Second) of Torts § 652D & cmt. a (Am. L. Inst. 1977).

---

[7] The District Court relied below on a different common-law analogue—intrusion upon seclusion—to conclude that *TransUnion* was satisfied. SA.7. (And it previously did the same in its decision in *Salazar*, 685 F. Supp. 3d at 241-42.) As the NFL argued below, that comparison does not hold water: no harm akin to an actionable "intrusion" within the meaning of that tort occurred here. *See* JA.359-60; *see also* JA.166-69. In *Salazar*, this Court declined to adopt the District Court's intrusion-upon-seclusion analogy, *see* 118 F.4th at 541 n.5, and Mr. Hughes does not rely on any analogy to that tort in his appellate brief, *see* Hughes Br. 18-20. The NFL accordingly does not address the issue further.

23

But even if the failure to allege publicity is not *alone* sufficient to deprive Mr. Hughes of standing under *Salazar*,[8] as the NFL argued below, Mr. Hughes's allegations are even further removed from the common-law public-disclosure tort due to the fact that Mr. Hughes failed to plausibly allege that he did not consent to the alleged disclosures to Facebook—the sole basis for his alleged "injury." It is hornbook law that consent provides an "absolute privilege" from traditional privacy torts, including public disclosure of private facts (and, for that matter, intrusion upon seclusion). Restatement (Second) of Torts § 652F cmt. b; *see also* David A. Elder, *Privacy Torts* § 3:9 (Dec. 2024 Update); William L. Prosser, *Privacy*, 48 Calif. L. Rev. 383, 419-20 (1960). That rule—which applies whether the consent is "express" or "implied" from the parties' conduct and circumstances, *see* Elder, *supra*, § 3:9— breaks any credible assertion that there is a "close relationship" between the alleged disclosures Mr. Hughes complains of and the harms addressed by the common-law public-disclosure tort—and, thus, any credible assertion of Article III standing.

---

[8] For clarity, the NFL disagrees with *Salazar*'s standing analysis. At least four circuits have held that plaintiffs lacked standing to pursue similar disclosure-based statutory-damages claims based solely on an absence of publicity. *Accord Barclift v. Keystone Credit Servs., LLC*, 93 F.4th 136, 146 (3d Cir. 2024); *Nabozny v. Optio Sols. LLC*, 84 F.4th 731, 735 (7th Cir. 2023); *Shields v. Prof. Bureau of Collections of Md., Inc.*, 55 F.4th 823, 829 (10th Cir. 2022); *Hunstein v. Preferred Collection & Mgmt. Servs., Inc.*, 48 F.4th 1236, 1240 (11th Cir. 2022) (en banc).

As the complaint, documents relied upon therein, and judicially noticeable facts all demonstrate, Mr. Hughes consented to the disclosures at issue—or, at the very least, failed to carry his affirmative burden to *plausibly* allege that any unconsented-to disclosures occurred (and, *a fortiori*, that any of the alleged disclosures inflicted a judicially cognizable injury). For starters, Mr. Hughes agreed to the NFL's Privacy Policy when he created his account on NFL.com. *See supra* p. 9; *accord Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 80-81 (2d Cir. 2017) (holding that users consent to policies conspicuously hyperlinked in sign-up page). The NFL Privacy Policy is extensively quoted in the complaint and can properly be considered on a motion to dismiss. *See, e.g.*, *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (on motion to dismiss, court may consider documents that the complaint "relies heavily upon" (citation omitted)). Mr. Hughes never disputed the terms of, or his agreement to, that Policy. And in language the complaint itself quoted, *see* JA.268 (¶ 27), the Privacy Policy discloses that the use of NFL.com may result in the collection of data including "[p]ages you view and links you click on," JA.327. Moreover, despite Mr. Hughes's statement that "nowhere . . . [i]s it disclosed" that video-viewing information will be shared "with third parties, including Facebook," JA.269 (¶ 29), the Privacy Policy states that "social networking services may be able to collect information about you, *including your activity on our Services*." JA.332 (emphasis added). The notion that Mr. Hughes

25

was somehow subjected to disclosures he was not informed of, and to which he did not consent by his acceptance of governing policies, is simply belied by the record.

But there is more.  Mr. Hughes *also* voluntarily signed up for a Facebook account, and the complaint never contests that Mr. Hughes agreed to Facebook's policies—which disclose Facebook's placement of cookies and tracking of its account holders' web browsing activities.  It is undisputed that the disclosures at issue here occurred only because Mr. Hughes signed up for a Facebook account and visited NFL.com with Facebook tracking cookies on his device.  *See supra* pp. 10-12.  Facebook informs its users of its policies and alerts them to the cookie-based tracking and ad-customization technologies at issue here.  *See Cookies Policy*, Facebook.com,  https://www.facebook.com/privacy/policies/cookies/  (last  visited Feb. 8, 2024) (Facebook Cookies Policy informing users that it "place[s] cookies on your computer or device and receive[s] information stored in cookies when you use or visit" third-party "websites and apps" that "incorporate Meta technologies");[9] *cf. Force v. Facebook, Inc.*, 934 F.3d 53, 59 n.5 (2d Cir. 2019) ("publicly available" Facebook terms and policies are "subject to judicial notice").  Critically, Mr. Hughes

---

[9] While the current policy is (as of this brief's filing) dated December 12, 2023, substantively identical language appeared in Facebook's policies well before the period of the alleged disclosures from 2020 onward.  *See Cookies & Other Storage Technology*, Facebook.com (policy as in effect Dec. 31, 2019), *available at* https://web.archive.org/web/20191231065306/https://www.facebook.com/policies/cookies/.

never contended otherwise in his complaint, and his conduct in continuing to use Facebook and never removing its cookies strongly suggests at least implied consent on his part. Indeed, although he asserted (wrongly) that *the NFL* did not get his consent for the disclosures at issue, *see* JA.260, 263, 265-67, 269-71, 273, 275-76, 278 (¶¶ 1, 12, 19, 24, 26, 29, 36, 39, 44, 50, 55, 66), he tellingly never denied consenting as to *Facebook*. That is a crucial point, given that the disclosures at issue here are part of a Facebook-built program that tracks Facebook users' activity on third-party websites, through Facebook cookies, in order to allow Facebook to personalize content (including ads).

In light of these NFL and Facebook policies, there is no comparison between Mr. Hughes's alleged "injury" and the intangible harms addressed by traditional privacy torts, including the public-disclosure tort—and thus no standing under *TransUnion*'s "close relationship" test. 141 S. Ct. at 2204. Having failed to plausibly allege any publicity, any unconsented-to disclosures, any reputational harm, or any other basis for establishing any legally cognizable harm, Mr. Hughes's allegations fall far short of alleging a harm analogous to the harms redressed by the common-law tort of public disclosure of private facts or any other common-law tort. As such, Mr. Hughes's allegations boil down to at most a mere technical violation of the VPPA without any concrete harm, which, under *TransUnion*, is not sufficient to confer Article III standing.

The District Court recognized that the NFL raised this distinct point about consent—which was "not raised in *Salazar*"—as an additional basis to find that Mr. Hughes lacks standing. SA.7. And it acknowledged that consent would traditionally be an absolute barrier to liability under traditional privacy torts. *Id.* at 7-8. But it disregarded the NFL's arguments on this point, instead relying on the complaint's conclusory (and carefully worded) allegations that Mr. Hughes did not agree to the disclosures. *Id.* at 8. Respectfully, that was error. For one thing, although Mr. Hughes insisted in the complaint that the NFL did not adequately secure consent from him, these assertions do not extend to *Facebook*, which as its public websites demonstrate, discloses its Pixel-based tracking program to its account holders. Moreover, the District Court erred by crediting Mr. Hughes's generic assertions that the NFL's Privacy Policy did not inform him of the disclosures. An examination of that Policy shows that Mr. Hughes *was* informed of the exact type of "information" tracking by "social networking services" at issue here. JA.332. In the face of these realities, Mr. Hughes's unadorned allegations that he was not informed of the disclosures were not plausible, and thus insufficient even at the pleading stage. *See Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011) (court need not accept the truth of allegations if "contradicted by more specific allegations or documentary evidence" properly considered on the pleadings).

28

On appeal, Mr. Hughes does not even attempt to address the NFL's consent-based standing argument. Instead, he rests solely on *Salazar*, contending that this Court's decision in that case settles the Article III standing issue here. *See* Hughes Br. 18-20. But *Salazar* did not consider the consent-based points the NFL has raised here. On the contrary, this Court in *Salazar* took it as a given that the Pixel-based disclosures at issue in that case were wholly "unauthorized." 118 F.4th at 540. In fact, this Court specifically declined to consider whether the plaintiff in *Salazar* "consented to disclosure of his [PII] by assenting to [the defendant's] privacy policy." *Id.* at 539 n.4. "Questions which merely lurk in the record," but are not "ruled upon," are "not to be considered as having been so decided as to constitute precedents." *Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 124-25 (2d Cir. 2010) (citation omitted), *aff'd*, 569 U.S 108 (2013). The NFL accordingly submits that *Salazar* does not control the outcome of the Article III standing question in this case, and that this Court remains free, as a matter of Circuit precedent, to hold that Mr. Hughes lacks standing.

Finally, Mr. Hughes may attempt to confuse the issue by arguing that the disclosures in the NFL's Privacy Policy were insufficient to satisfy the VPPA's highly specific *statutory* requirements for a consent defense *on the merits*. *Cf.* 18 U.S.C. § 2710(b)(2)(B). But standing and merits are distinct issues. And while Congress is free to define the contours of a consent-based merits exception to a cause

29

of action, it cannot legislate an Article III injury into existence. What matters under *TransUnion* is that the "injury" Mr. Hughes alleges bears no resemblance to a traditionally actionable harm *at common law*, not whether he stated a claim on the merits under modern statutory law.

### III. The District Court Correctly Dismissed Mr. Hughes's Suit for Failure to State a Claim.

Even if Mr. Hughes had standing, the District Court correctly dismissed his complaint. To adequately plead a claim under the VPPA, a plaintiff must plausibly allege, among other things, that (1) he or she qualifies as a protected "consumer" of the defendant "video tape service provider"; (2) the defendant "knowingly disclos[ed]" information about the plaintiff; and (3) the information disclosed qualifies as "personally identifiable information" within the statute's meaning. 18 U.S.C. § 2710(a)(1), (a)(3), (b)(1). Mr. Hughes has not plausibly alleged these elements.

Regarding Mr. Hughes's "consumer" status—the element the District Court found lacking below—the NFL does not dispute that *Salazar* undercuts the rationale the District Court proffered for dismissing Mr. Hughes's complaint. Assuming the truth of the allegations in the complaint, under this Court's decision in *Salazar*, Mr. Hughes would appear to qualify as a protected "consumer"—because he, like the plaintiff in *Salazar*, allegedly provided his name, email address, and other information to sign up for an NFL email newsletter.

To be clear, the NFL disagrees with *Salazar* for substantially the reasons explained in the appellee's brief in that case. *Compare* JA.105-09, 360-62, *with* Br. for Def.-Appellee 28-52, *Salazar v. Nat'l Basketball Ass'n*, No. 23-1147 (2d Cir. Dec. 5, 2023) (Doc. 50). The NFL accordingly believes the District Court's decision was correct, for substantially the reasons explained in the opinion below. *See* SA.9-11. But it recognizes that, as a matter of current Circuit precedent, *Salazar* resolves the "consumer" question. *See In re Guo*, 965 F.3d 96, 105 (2d Cir. 2020) ("three-judge panel[s]" are bound by a prior panel precedent (citation omitted)). While the NFL maintains that the District Court correctly held that Mr. Hughes failed to plausibly allege "consumer" status—and reserves the right to seek *en banc* or Supreme Court review of *Salazar*'s contrary interpretation of the statute—it does not brief the "consumer" issue further herein.[10]

---

[10] Mr. Hughes devotes much of his brief on appeal to relitigating *Salazar*'s correctness, despite the fact that it is largely beside the point at this juncture. *E.g.*, Hughes Br. 20-26. Mr. Hughes also spends considerable effort arguing that, even if *Salazar* was wrongly decided, the District Court's conclusion regarding his "consumer" status was incorrect because of his late-added allegations about NFL+. *E.g.*, Hughes Br. 29-30. Setting aside the impact of *Salazar*, the NFL again disagrees. In its view, the District Court's analysis was sound. Because Mr. Hughes failed to allege that he watched any prerecorded videos through NFL+, he did not allege that he ever used his NFL+ subscription to watch the kind of video materials the VPPA covers, i.e., "prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4). Thus, he failed to allege any disclosures that pertained to his activities as a "consumer" of "goods or services *from a video tape service provider*," 18 U.S.C. §2710(a)(1) (emphasis added)—a statutory phrase that the NFL maintains, when properly understood, is limited to the kind of goods or services "video tape service providers" are defined as offering. Be that as it may,

31

However, *Salazar* does not prevent this Court from affirming the District Court's decision on alternative grounds, even at the three-judge panel stage. "It is well settled that [this Court] may affirm [a district court's decision] on any grounds for which there is a record sufficient to permit conclusions of law, including grounds not relied upon by the district court." *CBF Indústria*, 850 F.3d at 78 (quoting *In re Arab Bank, PLC Alien Tort Statute Litig.*, 808 F.3d 144, 157-58 (2d Cir. 2015)). That includes cases where intervening Circuit precedent undermines the basis for a district court's decision, but other grounds for affirmance exist. *See, e.g.*, *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d at 118.

This Court should apply that rule here and affirm on alternative grounds. Regardless of whether Mr. Hughes qualifies as a protected "consumer," he failed to plausibly allege that the NFL "knowingly disclosed" his PII. *See infra* Part III.A. Further, he also failed to plausibly allege that any PII about him was disclosed *at all* because he failed to plausibly allege that his FID was personally identifying, *see infra* Part III.B.1, and because he failed to plausibly allege that information about his viewing of *prerecorded* videos was disclosed as is required for the VPPA's restrictions to apply. *See infra* Part III.B.2.[11]

---

because *Salazar* establishes that Mr. Hughes was a protected "consumer" regardless of his NFL+ allegations, the point is academic for present purposes.

[11] The NFL notes that several of the issues raised herein overlap with topics briefed in *Solomon v. Flipps Media, Inc.*, No. 23-7597 (2d Cir.), another VPPA case

A.    Mr. Hughes Failed to Plausibly Allege That the NFL "Knowingly Disclosed" His PII.

This Court should affirm the District Court's decision because Mr. Hughes failed to plausibly allege that *the NFL* "disclose[d]," much less "knowingly" disclosed, his PII.  18 U.S.C. § 2710(b)(1).  Rather, as the complaint itself candidly admits, Mr. Hughes's *own device* disclosed the alleged PII.

Although the District Court declined to reach this issue below, this Court has unquestioned authority to decide the issue and affirm on that basis.  *See supra* p. 32. While Mr. Hughes passingly asserts that this argument is "fact-intensive" and thus unsuited for initial resolution in this Court, Hughes Br. 36, Mr. Hughes identifies not a single disputed fact about how the Pixel operates.  Regardless, the issue is purely legal by definition, as it concerns the adequacy of the complaint's allegations. *See Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012) ("Whether a complaint alleges sufficient facts to state a claim on which relief can be granted is a question of law . . . ."); *De Jesus v. Sears, Roebuck & Co., Inc.*, 87 F.3d 65, 69 (2d Cir. 1996) ("A motion to dismiss is designed to test the legal sufficiency of the complaint, and thus does not require the Court to examine the evidence at issue." (citation omitted)).  That makes it ripe for decision, even by Mr. Hughes's

---

involving the Facebook Pixel.  That case was argued on May 13, 2024, but has not, as of this brief's filing, yet been decided.

own admission. *See* Hughes Br. 36 (conceding that this Court may exercise discretion to address "purely legal" issues in the first instance).

###### 1. *Mr. Hughes Failed to Plausibly Allege That the NFL "Disclosed" His PII.*

To begin, Mr. Hughes failed to plausibly allege that *the NFL*, as opposed to Mr. Hughes's own device, "disclose[d]" his PII. 18 U.S.C. § 2710(b)(1). This is made clear from straightforward allegations in the complaint, which themselves reflect basic and widely recognized facts about how the Facebook Pixel works.

The only PII that Mr. Hughes alleges was disclosed to Facebook is the combination of his FID along with data identifying NFL pages containing videos, which he asserted could together be used to identify what NFL.com videos he clicked on. JA.261, 272-73 (¶¶ 5, 41-42). According to the complaint, this information is disclosed to Facebook because, when a user with Facebook cookies installed on his or her browser visits a website, Facebook Pixel code on the website "*causes*" that information "to be transmitted to Facebook *by the user's browser or App*." JA.270 (¶ 35) (emphasis added). In other words, Mr. Hughes alleges that his own device, not the NFL, disclosed the relevant information.

The only example web session in the complaint underscores the point. *See* JA.273 (¶ 42). Mr. Hughes shows an HTTP request allegedly demonstrating the disclosure of "the content name of the video," the URL, and the user's FID. *Id.* As the caption explains, this HTTP request is "sent *from the [user's] device* to

34

Facebook." *Id.* (emphasis added). Mr. Hughes's own illustrative example therefore shows that the complained-of disclosure is made by his device's browser, not the NFL. *See Buechler v. Gannett Co., Inc.*, No. 22-cv-1464, 2023 WL 6389447, at *4 (D. Del. Oct. 2, 2023) (dismissing Facebook Pixel-related VPPA claim where the allegations "appear[ed] to establish that the subscriber-users themselves and/or Facebook—not [defendant]—implement the 'Tracking Methods' . . . that result in the disclosure of Plaintiffs' PII and Video Watching Data to Facebook").

To be clear, this is not some marginal technicality about how the Facebook Pixel technology works. It reflects the basic reality that this lawsuit revolves around a *Facebook* program for tracking *Facebook* users by means of cookies installed by *Facebook* on those users' devices—and disclosures *from* those devices back to Facebook when those users visit third-party sites that contain *Facebook's* Pixel. Contrary to Mr. Hughes's efforts to distort the issues, this case simply does not concern disclosures of PII held by those third parties, like the NFL, that merely participate in Facebook's analytics program by installing the Pixel.

The point is starkly illustrated by the absence of any allegations in the complaint that the NFL ever even *possessed*, let alone disclosed, Mr. Hughes's FID. To be sure, Mr. Hughes's complaint was carefully drafted to muddy the issues by alleging that the NFL retains various forms of personal information about users. *See* JA.271 (¶ 38) (alleging NFL keeps a "database" of information such as "names and

e-mail addresses"). But even if true, that is a distraction as none of that information is alleged to have been disclosed to Facebook, and thus none is relevant to the alleged VPPA violations. The only personal identifier Mr. Hughes alleges was *disclosed to Facebook* was his FID. And the only source of FID information alleged in the complaint is "one or more personally identifiable FID cookies on [Mr. Hughes'] browser," JA.270 (¶ 35), i.e., cookies on Mr. Hughes's own computer that were placed there by Facebook. *See supra* pp. 10-12; *see also Smith v. Facebook, Inc.*, 262 F. Supp. 3d 943, 948 (N.D. Cal. 2017) (noting that "Facebook puts cookies on visitors' computers," including a cookie containing a user's FID). Mr. Hughes does not allege that the NFL placed the relevant cookie on his browser or that it can or did access the information contained on this Facebook cookie. *Cf.* JA.274 (¶ 48) (alleging provision of various forms of information to the NFL, but not FID).[12]

Mr. Hughes's claim thus fails under the plain text of the statute. The VPPA only forbids video tape service providers from "knowingly disclos[ing]" their consumers' PII. 18 U.S.C. § 2710(b)(1). But the NFL cannot "disclose[]" information that it does not even possess. *See Atl. Diving Supply, Inc. v. Basnight*,

---

[12] Mr. Hughes alleges that he provided his "name, address, email address, [and] IP address" to the NFL, as well as his "device ID" (whatever that is). JA.274 (¶ 48). Although he adds a generic, catch-all allegation that he provided "any cookies and other demographic, device, geolocation, and other data associated with his devices," *id.*, he does not allege that a Facebook "FID cookie" was on his device at the moment he signed up for an email newsletter, let alone that the NFL ever actually accessed or recorded his FID.

No. 22-cv-298, 2022 WL 5568083, at *13 (E.D. Va. Sept. 21, 2022) ("[A]s a matter of both law and common sense, [a party] cannot disclose—inevitably or otherwise—information that he does not possess . . . ." (citation omitted)); *Chutich v. Green Tree Acceptance, Inc.*, No. 88-cv-869, 1993 WL 173813, at *9 (D. Minn. Apr. 19, 1993) ("[A] corporation cannot disclose what it does not know . . . ."); *cf. Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 986 (9th Cir. 2017) (rejecting VPPA claim where defendant never possessed the information necessary to actually identify plaintiff).

Charitably construed, what Mr. Hughes alleges is that the NFL *caused* his device to disclose PII. In other words, although Mr. Hughes admits the disclosures came from his own device, and occurred because his device was configured with Facebook cookies as a result of his election to join Facebook, Mr. Hughes's stance is that the NFL incurred VPPA liability because the disclosures would not have occurred if the NFL had not also installed Facebook Pixel code on its website. In short, Mr. Hughes's theory is that the NFL is liable because its actions were a "but-for" cause of disclosures *his device* made.

That argument cannot be squared with the statutory text. VPPA claims may only be brought against a defendant who "discloses" the PII at issue (18 U.S.C. § 2710(b)(1)), i.e., the defendant must be *the party doing the disclosing*. Congress could have, but did not, create broader liability by authorizing claims against a party that merely "causes" a disclosure. *See United States v. Sylvester*, 605 F.2d 474, 475

(9th Cir. 1979) (holding that a statute reaching "one who 'causes [wildlife] to be sold in interstate or foreign commerce'" is "far more broadly worded" than if the statute applied only to one who "sells" wildlife). Indeed, it has done so in other statutes. *See* 15 U.S.C. § 6821 (prohibiting any person to "cause to be disclosed . . . customer information of a financial institution"); 18 U.S.C. App. 3 § 5 ("defendant reasonably expects to disclose or to cause the disclosure of classified information"); 10 U.S.C. § 949p-5 ("accused reasonably expects to disclose, or to cause the disclosure of, classified information"). Congress thus "knew how" to "impose . . . liability" for causing a disclosure "when it chose to do so"—but under the VPPA, "it did not." *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 176-77 (1994).

Mr. Hughes tellingly does not contest any of the NFL's observations about how the alleged disclosures occurred. Nor does he offer a contrary analysis of the VPPA's text. Instead, he offers the atextual (and wrong) assertion that the NFL is subject to VPPA liability because it "intentionally created the system" that "gave rise" to the disclosures. Hughes Br. 37. Again, that is not a textual argument. But, more importantly, it is false. *Facebook*, not the NFL, "created the system" that "gave rise" to the disclosures, *id.*, and Mr. Hughes chose to participate in that system—in which *his browser* disclosed to Facebook information *the NFL is never even alleged to possess*. The fact that the NFL *also* allegedly participated in the Pixel program

38

by "intentionally install[ing]" Facebook Pixel code on its website (*id.*) is insufficient to establish that the NFL itself disclosed anything and is beside the point.

Mr. Hughes's failure to engage with the statutory text on this issue is nothing new. When the NFL raised this argument below, Mr. Hughes advanced an even more floridly atextual argument, asserting that the NFL should be liable because it "opened a digital door" by installing the Facebook Pixel. JA.392 (citation omitted). But whether Mr. Hughes frames his argument in metaphor or otherwise, he cannot seek to escape the VPPA's plain language, which requires a defendant to "disclose[]" PII. 18 U.S.C. § 2710(b)(1). As Mr. Hughes emphasized in his opening brief, courts "must interpret the law as Congress has written it," not as one might "wish it to be." Hughes Br. 35 (quoting *Zuni Pub. Sch. Dist. No. 89 v. Dep't of Educ.*, 550 U.S. 81, 122 (2007) (Scalia, J., dissenting)).

Regardless, the text is in harmony with congressional purpose. As explained above, *see supra* pp. 6-8, the VPPA was not enacted as a broad privacy charter. It was narrowly enacted to target privacy breaches akin to the intentional release of Judge Bork's video rental records to a journalist by a video rental store—i.e., circumstances where a "video tape service provider" holds records about its customers' video-viewing activities and releases that information. *Cf. In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d 262, 288 (3d Cir. 2016) (the VPPA "serves different purposes, and protects different constituencies, than other, broader

39

privacy laws"). It was not enacted as a paternalist measure to protect consumers from opening accounts with, and allowing browser cookies to be installed by, companies like Facebook that track their account holders' browsing activities. Indeed, precisely because the alleged disclosures were made by Mr. Hughes's own browser, Mr. Hughes remained fully capable of preventing those disclosures— notably, by deleting his Facebook "FID cookies," JA.270 (¶ 35). The fact that Mr. Hughes was fully in control of his relationship with Facebook, and could easily have prevented the disclosures, illustrates how far the facts of this case are from the kind of disclosures the VPPA was intended to address—and why the statute should be enforced according to its appropriately narrow text. *Cf. Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1066-67 (9th Cir. 2015) (rejecting VPPA claim where alleged disclosure resulted from the plaintiffs' own decision to give third parties access to their Netflix accounts).[13]

---

[13] The point is starkly illustrated by the fact that, on Mr. Hughes's understanding of the statute, he could continue to browse dozens *more* websites—fully aware of the Facebook Pixel, and fully aware of his ability to prevent any disclosures by deleting his cookies—and file a lawsuit against the owner of each website he visits, as a calculated strategy to harvest money. Plainly, that is "far afield" from "the circumstances that motivated the [VPPA]'s passage." *In re Nickelodeon*, 827 F.3d at 290.

2. *Mr. Hughes Failed to Plausibly Allege That the NFL "Knowingly" Disclosed His PII.*

Even if the NFL's indirect role in the disclosures was sufficient (which it is not), the claim nonetheless fails because the complaint does not plausibly allege that the disclosures were done "knowingly." 18 U.S.C. § 2710(b)(1). Courts interpreting the VPPA have found that "'[k]nowingly' means consciousness of transmitting the private information. It does not merely mean transmitting the code." *In re Hulu Priv. Litig.*, 86 F. Supp. 3d 1090, 1095 (N.D. Cal. 2015) (citation omitted). Therefore, "[i]f [the NFL] did not know that it was transmitting both an identifier and the person's video watching information, then there is no violation of the VPPA." *In re Hulu Priv. Litig.*, No. 11-cv-3764, 2014 WL 1724344, at *15 (N.D. Cal. Apr. 28, 2014).

Mr. Hughes's complaint does not contain any allegations that the NFL had knowledge of any number of facts necessary for Mr. Hughes's PII to be disclosed. For instance, the complaint is devoid of allegations that the NFL knew Mr. Hughes had a Facebook account (and that his Facebook account contained information sufficient to identify him), or that he had Facebook cookies installed on his browser, when he watched "Video Media" on NFL.com. Absent these circumstances, no disclosure of Mr. Hughes's PII to Facebook would have occurred. Because the lawfulness of a disclosure "cannot depend on circumstances outside of [the NFL's]

control" or knowledge, *Mollett*, 795 F.3d at 1066, Mr. Hughes's VPPA claim fails for this reason as well.

Mr. Hughes's passing attempts to brush off this point lack merit. Despite Mr. Hughes's suggestion, the NFL has never argued that it "did not 'know' how the Facebook Pixel worked" when it installed the Pixel on NFL.com. Hughes Br. 38. Even if the NFL understood how the Pixel functioned as a general matter, the complaint fails to plead that the NFL had any actual knowledge at any point that *Mr. Hughes's* PII was disclosed. Indeed, Mr. Hughes's attempt to elide the difference between (1) general knowledge about how the Facebook Pixel technology works, and (2) specific knowledge about any disclosure of *his* PII, flies in the face of the statute's narrowly targeted purpose. The VPPA provides a "person aggrieved" by a "video tape service provider['s] . . . knowing[] disclos[ure]" of that person's PII— as occurred to Judge Bork—with a cause of action. 18 U.S.C. § 2710(b)(1), (c)(1). It was neither designed nor written to serve as a vehicle for class actions on behalf of individuals who signed up for accounts with the alleged recipient of PII (here, Facebook), allowed their devices to be configured to communicate PII to that recipient, and then visited the websites of third parties (like the NFL) who lacked knowledge of those circumstances and, therefore, whether any given visitor's information would be disclosed. Mr. Hughes failed to plausibly allege that the NFL

42

either disclosed his PII or that it did so knowingly, and his claim thus fails as a matter of law.

> **B.** Mr. Hughes Failed to Plausibly Allege That Any PII About Him Was Disclosed.

Even if Mr. Hughes had plausibly alleged that the NFL knowingly disclosed his FID in combination with information identifying videos he watched, there is an independent reason why he failed to state a claim: Mr. Hughes did not plausibly allege that this information constituted PII within the meaning of the VPPA. As emphasized above, the VPPA only forbids disclosures of "personally identifiable information," 18 U.S.C. § 2710(b)(1), which is defined as information that (1) "personally" identifies an individual, and (2) identifies "specific video materials or services" that person requested or obtained, *id.* § 2710(a)(3). Here, Mr. Hughes failed to plausibly allege that either prong was satisfied. And for either or both of those reasons, the District Court's dismissal should be affirmed.

> **1.** *Mr. Hughes Failed to Plausibly Allege That His Facebook Profile Contains Identifying Information.*

First, Mr. Hughes's complaint failed to allege that the disclosures at issue "personally identif[ied]" him. 18 U.S.C. § 2710(a)(3). The VPPA defines PII to "include[] information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." *Id.* While there "may be breathing room" in this definition "to explore what exactly [counts

43

as] 'personally identifiable information,'" *Salazar*, 118 F.4th at 549 n.10, the textual focus on *personally* identifying information demonstrates that the statute is limited to information that "can be used to identify an individual" in a personal way, *Eichenberger*, 876 F.3d at 984 (emphasis omitted).  Thus, among courts of appeals to address the question, the prevailing view, adopted by the Third and Ninth Circuits, is that PII encompasses "only information that 'readily permit[s] *an ordinary person* to identify a [particular individual as having watched certain videos].'"  *Id.* at 985 (alterations in original) (quoting *In re Nickelodeon*, 827 F.3d at 290).  And while the First Circuit has adopted a somewhat broader understanding—under which information need only be "reasonably and foreseeably likely to reveal" an individual's identity to the recipient in order to qualify as PII, *Yershov v. Gannett Satellite Info. Network, Inc.*, 820 F.3d 482, 486 (1st Cir. 2016)—the fundamental point remains that the information must be capable of *identifying* a user *personally* and individually, akin to the disclosures that motivated the VPPA's enactment.

To the extent this Court considers it necessary to reach the issue, it should adopt the majority "ordinary person" standard because, as the Ninth Circuit has explained, that approach best fits the statute's text and purpose.  "[T]he statute views disclosure from the perspective of the disclosing party" by focusing on the information a defendant "knowingly discloses."  *Eichenberger*, 876 F.3d at 985 (quoting 18 U.S.C. §2710(b)(1)).  And because the statute focuses on the disclosing

party rather than the recipient, PII must have the same scope irrespective of a particular recipient's ability to decipher the disclosed information. *Id.* A contrary rule "would make '[t]he lawfulness of [a] disclosure . . . depend on circumstances outside of [a defendant's] control.'" *Id.* (first and second alterations in original) (quoting *Mollett*, 795 F.3d at 1066); *see also In re Nickelodeon*, 827 F.3d at 284-90 (similar rationale and exploration of legislative history). But it is ultimately unnecessary for this Court to choose between the Third and Ninth Circuits' "ordinary person" test and the First Circuit's "reasonably and foreseeably likely" test— because Mr. Hughes failed to plausibly allege that the transmission of his FID constituted PII under *either* approach.

Start with the Third and Ninth Circuit's "ordinary person" test. Mr. Hughes's FID is the sole piece of "identif[ying]" information Mr. Hughes alleges was disclosed. *See* JA.261 (¶ 5). But an FID is merely a numerical string—for example, the nine-digit "c_user" field in the complaint's example session. JA.273 (¶ 42). It is a "static digital identifier[]" that has no meaning in itself, and does not *alone* reveal any person's identity. *In re Nickelodeon*, 827 F.3d at 283. The crux of Mr. Hughes's theory that the FID qualifies as "personally identifying" is the allegation that "ordinary persons who come into possession of [an] FID can connect to [the associated] Facebook profile," JA.270-71 (¶ 36)—in other words, that an FID can be used to look up the "corresponding Facebook profile" matched to that FID,

JA.261 (¶ 5); *see also* JA.270 (¶ 35) (similar). Mr. Hughes offers no other theory about how an ordinary person could use his numerical FID to identify him, save by looking up the corresponding Facebook profile.

But this theory is fatally flawed because the complaint does not allege that Mr. Hughes's Facebook profile contains his name or other identifying information. Nowhere does the complaint discuss the type of information found on Mr. Hughes's Facebook profile. Indeed, the complaint says nothing at all about his Facebook profile, save that he *has* one. *Cf.* JA.263, 275 (¶¶ 12, 49). Nor can the Court merely assume that the profile he allegedly created contained information that was real and personally identifying. *Cf. DotStrategy Co. v. Facebook Inc.*, No. 20-cv-170, 2020 WL 6591366, at *2, *7 (N.D. Cal. Nov. 11, 2020) (stating "a reasonable consumer would understand that not all users on Facebook . . . adhere to Facebook's authenticity policy," which "requires users to use their 'real identities'" (citation omitted)). This is not a hypothetical concern. In fact, at least one VPPA plaintiff recently revealed in an amended pleading that his Facebook profile did *not* contain his real name, but rather used a "pseudonym." Am. Class Action Compl. ¶ 22, *Joiner v. NHL Enters., Inc.*, No. 23-cv-2083 (S.D.N.Y. Nov. 13, 2024). Needless to say, one cannot personally identify an individual by looking up a pseudonymous Facebook profile.

46

While the Court may "draw reasonable inferences in [Mr. Hughes's] favor," it cannot "speculate as to crucial facts about which the . . . complaint is nearly silent." *Neal v. Town of E. Haven*, 694 F. App'x 44, 46 (2d Cir. 2017) (summary order). Whether Mr. Hughes's Facebook profile contains his real identifying information is just such a "crucial fact." Consistent with that common-sense understanding, at least five district court decisions have held that while an FID *may* constitute PII where the FID corresponds to a Facebook page that contains information revealing a consumer's unique personal identity, a plaintiff must allege that his or her *own* Facebook profile contains such information to state a plausible VPPA claim. *See Smith v. Trinity Broad. of Tex., Inc.*, No. 24-cv-1046, 2024 WL 4394557, at *3 (C.D. Cal. Sept. 27, 2024); *Heerde v. Learfield Commc'ns, LLC*, No. 23-cv-4493, 2024 WL 3573874, at *4 (C.D. Cal. July 19, 2024); *Edwards v. Learfield Commc'ns, LLC*, 697 F. Supp. 3d 1297, 1307 (N.D. Fla. 2023); *Solomon v. Flipps Media, Inc.*, No. 22-cv-5508, 2023 WL 6390055, at *3 (E.D.N.Y. Sept. 30, 2023), *appeal pending*, No. 23-7597 (2d Cir.) (argued May 13, 2024); *Ghanaat v. Numerade Labs, Inc.*, 689 F. Supp. 3d 714, 720 (N.D. Cal. 2023); *cf. also Wilson v. Triller*, 598 F. Supp. 3d 82, 92 (S.D.N.Y. 2022) (similar, in case involving profiles on "Triller" app).

The same result would obtain even if this Court adopted the First Circuit's "reasonably and foreseeably likely" test for whether information counts as PII. Under that marginally broader test, a piece of information (such as an FID) might

count as PII even if an "*ordinary*" recipient could not identify an individual with it, so long as it was reasonably and foreseeably likely that the *actual* recipient could do so. But here, the complaint does not allege that Facebook has Mr. Hughes's real name, address, phone number, or any other identifying information. Nor does he allege that Facebook otherwise maintains the ability to locate any of this information by cross-referencing Mr. Hughes's FID—which, again, is the only identifier the NFL is alleged to have disclosed to Facebook. Notably, although the complaint refers generically to an alleged "trove" of personal information Facebook has about its "users," JA.272 (¶ 40), Mr. Hughes does not allege that *he* submitted his real identifying information to Facebook, and if so, what that information was.[14] Mr. Hughes's claim thus fails under any extant standard for what qualifies as PII.

Tellingly, when the NFL raised this argument below, Mr. Hughes's opposition briefing was silent regarding his failure to allege that his Facebook profile identified him—tacitly admitting this critical lacuna in his complaint. (Nor did he seek leave

---

[14] This contrasts with the facts of *Yershov*, in which the plaintiff alleged that when a user viewed a video on the defendant's app, the defendant disclosed the title of the video, the GPS coordinates of the user's device at the time the video was viewed, and certain identifiers associated with the user's device, such as its Android ID. 820 F.3d at 484. The *Yershov* court found these allegations—with particular focus on the disclosure of the device's GPS coordinates—sufficient to allege a disclosure of PII. *Id.* at 486; *accord In re Nickelodeon*, 827 F.3d at 289 (similarly describing *Yershov*'s focus on GPS coordinates). There is no allegation in Mr. Hughes's complaint that the NFL disclosed GPS coordinates revealing the physical location of Mr. Hughes's device.

to amend his complaint again to remedy that fatal flaw.)  *Compare* JA.393-94, *with* JA.409-10, 414 n.7.  Mr. Hughes's brief on appeal is no better.  Consigning the issue to an afterthought, he primarily rests on an undeveloped assertion that it is reasonable to infer that his Facebook page contains his real name.  *See* Hughes Br. 37.  But as explained above, numerous district courts addressing the same issue have disagreed—and for good reason.  *See supra* p. 47.

Finally, while Mr. Hughes opaquely asserts that "a Facebook ID, *by itself*, individually identifies the consumer," Hughes Br. 37 (emphasis added), it is difficult to discern what this could mean.  While an FID may "represent[]" an individual (or, more accurately, a particular Facebook account) in some abstract sense, *id.* (citation omitted), it plainly cannot be used to *personally* identify an individual on its own.  Unless it is connected to other identifying information (such as a real name), it is just a meaningless numerical string.  To the extent Mr. Hughes suggests that a static numerical identifier like an FID qualifies as PII in itself, regardless of its connection to information that personally identifies a real-world individual, he implicitly asks this Court to create a circuit split with the Third, Ninth, *and* First Circuits—an invitation this Court should decline.  *See In re Nickelodeon*, 827 F.3d at 286 ("static digital identifiers," without more, fall outside VPPA's "definition of personally identifiable information"); *Eichenberger*, 876 F.3d at 985-86 (same); *Yershov*, 820 F.3d at 486 (disclosed information constituted PII only when recipient had access to

other data allowing it to "link" that information "to a certain person by name, address, phone number, and more").

> 2. *Mr. Hughes Failed to Plausibly Allege That Information About His Viewing of Prerecorded Videos Was Disclosed.*

Mr. Hughes also failed to plausibly allege that any disclosures to Facebook identified "specific video materials or services" within the statute's meaning. 18 U.S.C. § 2710(a)(3). Specifically, he failed to allege that the NFL "Video Media" he accessed was *prerecorded*, as opposed to live. But, as Mr. Hughes himself conceded below, *see* SA.10, only prerecorded video content falls within the ambit of the statute's prohibition on disclosure. Indeed, to the NFL's knowledge, every court that has addressed the issue has concluded that the VPPA prohibits only disclosures regarding prerecorded, as opposed to live, video content. *See, e.g.*, *Solomon*, 2023 WL 6390055, at *3-4 (describing "uniform[]" view that "VPPA claims only apply to 'prerecorded' video content" (citation omitted)); *Sellers v. Bleacher Rep., Inc.*, No. 23-cv-368, 2023 WL 4850180, at *3 (N.D. Cal. July 28, 2023) (stating "lower courts have consistently held" that the VPPA does not cover live content); *Stark v. Patreon, Inc.*, 635 F. Supp. 3d 841, 851 (N.D. Cal. 2022) (same); *Louth v. NFL Enters. LLC*, No. 21-cv-405, 2022 WL 4130866, at *4 (D.R.I. Sept. 12, 2022) (same).

Here, Mr. Hughes failed to plausibly allege that he viewed prerecorded NFL videos.[15] Although he alleged that he viewed unspecified NFL "Video Media" after signing up for an NFL newsletter and NFL+, JA.262-63, 275 (¶¶ 12, 49), nothing about the "Video Media" Mr. Hughes watched is specified, including whether it was prerecorded. Notably, although the complaint included screenshots of an exemplar session in which an unspecified "user" views a prerecorded video, there is no allegation that this "user" was Mr. Hughes.[16] The absence of any allegation that Mr. Hughes himself watched prerecorded videos is particularly relevant given his focus on his status as a subscriber of NFL+, a premium service marketed, in significant part, as a means to access to live content. *See supra* pp. 8-9.

On appeal, Mr. Hughes admits "the NFL argued [below]—and the district court held" that his complaint should be dismissed because of his "failure to allege

---

[15] Mr. Hughes notes that the statutory definition of PII refers to information identifying a person as having *requested* or *obtained* specific video materials, which does not necessarily entail *viewing* those materials. *See* Hughes Br. 30; *see also id.* at 34. That is a red herring. Mr. Hughes nowhere alleged that he requested or obtained any "specific video materials" that he did not also view. The allegations in the complaint solely concern his alleged "viewing" of NFL content and corresponding alleged disclosures of what the complaint calls "Personal Viewing Information." JA.263, 275 (¶¶ 12, 49).

[16] Moreover, it almost certainly was *not* him, as the complaint's evolution makes apparent. This lawsuit was originally filed on behalf of a different named plaintiff (Israel James). *See supra* p. 10. But both the screenshots and the FID in the exemplar session ("c_user" field) remained the same before and after Mr. Hughes was substituted as named plaintiff. *Compare* Compl. ¶¶ 37-38, Dist. Ct. Dkt. 1 (Sept. 14, 2022), *with* JA.272-73 (¶¶ 41-42).

he watched prerecorded video content." Hughes Br. 33 n.4.[17]  And he never points to any allegation in the complaint that he watched prerecorded NFL videos.  *Accord id.* (tacitly conceding absence of any "specific allegation about whether the videos were live or prerecorded").  That is sufficient basis to affirm.  While Mr. Hughes pursues several stratagems for avoiding that outcome, not one withstands scrutiny.

<u>First</u>, Mr. Hughes seeks refuge in the details of the District Court's legal reasoning:  namely, that the District Court framed his "failure to allege he watched prerecorded video content" as a failure to allege "consumer" status *vis-à-vis* the alleged disclosures, a conclusion that Mr. Hughes argues cannot survive *Salazar*.  Hughes Br. 33 n.4.  This effort to dodge the issue fails.  To be sure, the NFL framed its argument below, and the District Court framed its holding, around the "consumer" element of a VPPA claim, as opposed to the "personally identifiable information" element.  *See* SA.10-11.  That framing was only natural pre-*Salazar*.  But while *Salazar* may establish for now that Mr. Hughes adequately alleged he was a protected "consumer," it does not undermine the bottom-line outcome that, because he failed to allege that he viewed prerecorded video content, he failed to state a plausible VPPA claim.  After all, as Mr. Hughes is well aware, there is a

---

[17] Even if the issue had not been raised at all below, this Court would retain its "discretion" to affirm on this basis, given that "there is no need for additional fact-finding" on the point.  *United States ex rel. Keshner v. Nursing Personnel Home Care*, 794 F.3d 232, 234 (2d Cir. 2015) (citation omitted).

simple alternative path to the same result the District Court reached, and one that is fully consistent with *Salazar*—namely that "Mr. Hughes's failure to allege he watched prerecorded video content meant the alleged disclosures lacked 'personally identifiable information' under Section 2710(a)(3)." Hughes Br. 33 n.4; *accord id.* at 29-30 (noting that the District Court "may" ultimately have derived its holding from Section 2710(a)(3)).

The VPPA forbids disclosures only by "video tape service provider[s]," defined as entities that offer "prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4), (b)(1). Had Congress wished to regulate disclosures concerning live content, it would not have explicitly limited that definition to purveyors of "prerecorded" videos. It thus stands to reason that the phrase "video materials or services" in Section 2710(a)(3)'s definition of "personally identifiable information" refers to the same type of content Congress was concerned with when it defined the scope of covered providers—i.e., *prerecorded* videos. *See In re Barnet*, 737 F.3d 238, 250 (2d Cir. 2013) (when "two sections [] share the same purpose, the parallel provisions can, as a matter of general statutory construction, be interpreted to be *in pari materia*" (citation omitted)).[18]

---

[18] This is consistent with the 1988 Senate Report on the VPPA, which identified "laser discs, open-reel movies, or CDI technology" as types of technologies that provide "similar audio visual materials" delivered by video tape service providers, S. Rep. No. 100-599, at 12 (1988)—which one court has observed "suggests Congress's intent to cover new technologies for pre-recorded video content." *In re*

Second, Mr. Hughes offers a newly minted argument that the VPPA *does* cover disclosures regarding live content. Hughes Br. 31. But the statute cannot bear that interpretation. In fact, Mr. Hughes himself "readily concede[d]" in the District Court that "the VPPA covers only the rental, sale, or delivery of prerecorded video cassette tapes or similar audiovisual materials." JA.390 (internal quotation marks omitted); *see also* SA.10. That concession was understandable. Reading Section 2710(a)(3) as limited to prerecorded materials is consistent with the ordinary meaning of "video materials or services," particularly in the context of a statute focused on "video tape[s]" and "provider[s]" thereof. 18 U.S.C. § 2710(a)(3), (b). And regardless of what Section 2710(a)(3) might be interpreted to mean in isolation, courts do not "construe each [statutory] phrase literally or in isolation," *Fed. Hous. Fin. Agency v. UBS Americas Inc.*, 712 F.3d 136, 141 (2d Cir. 2013) (citation omitted), but "in context with and by reference to the whole statutory scheme," so that the meaning "of [each] statutory provision . . . is consonant with the rest of the statute." *Auburn Hous. Auth. v. Martinez*, 277 F.3d 138, 144 (2d Cir. 2002). Mr. Hughes's latest interpretation of the statute flunks that test by rendering nonsensical the statute's limitation of liability to purveyors of "prerecorded" video. 18 U.S.C. § 2710(a)(4).

---

*Hulu Priv. Litig.*, No. 11-cv-3764, 2012 WL 3282960, at *6 (N.D. Cal. Aug. 10, 2012).

Consider the position of a live TV purveyor (e.g., a company specializing in traditional pay-per-view sports offerings) with millions of subscribers. Such a company could freely disclose information about its users' viewing choices under the VPPA because—as a business that deals solely in live content—it is not a "video tape service provider." 18 U.S.C. § 2710(a)(4). Suppose, however, that the same company then decides to offer a DVD recording of one its prior offerings. On Mr. Hughes's view, the company thereby incurs crushing statutory-damages liability for its previously exempt disclosure of information regarding its live TV viewers' consumption of live content. Mr. Hughes never attempts to explain how such arbitrary outcomes could credibly be attributed to Congress. Clearly, the more natural way to read the statute is to interpret Section 2710(a)(3) *in pari materia* with Section 2710(a)(4), thereby harmonizing the meaning of the statute's provisions.

Third, Mr. Hughes asserts—in a single sentence of a footnote—that his failure to include any "specific allegation about whether the videos were live or prerecorded" should be forgiven because, in his view, "inferences in both directions were equally reasonable." Hughes Br. 33 n.4. But while it may be logically "*consistent*" with Mr. Hughes's allegations that the unspecified "Video Media" he watched was prerecorded, that is insufficient. *E.E.O.C. v. Port Auth. of N.Y. & N.J.*, 768 F.3d 247, 258-59 (2d Cir. 2014) (emphasis added) (citation omitted). Rather, Mr. Hughes was required to plead facts affirmatively "*suggestive* of . . . a finding of

misconduct." *Id.* (emphasis added) (citation omitted). When a VPPA defendant offers a mix of live and prerecorded content to which the plaintiff had access, a bare allegation that the plaintiff consumed unspecified "video content" does not "suggest[] an inference one way or the other" as to whether the content was prerecorded and, therefore, whether the plaintiff's PII was disclosed as prohibited by the statute. *Stark*, 635 F. Supp. 3d at 851.

<u>Fourth</u>, and finally, Mr. Hughes weakly suggests that the District Court "should have invited . . . clarification via amendment." Hughes Br. 33 n.4. But Mr. Hughes's effort to use his appeal to secure a previously unrequested opportunity for further amendment must be rejected. When the NFL moved to dismiss the *already twice-amended* complaint, it specifically raised Mr. Hughes's failure to allege that he watched prerecorded content. Mr. Hughes never requested another opportunity to amend his complaint, *see generally* JA.374-400; *cf. also* JA.414 n.7—despite his counsel being well aware of how to make such a request. *See* JA.157 n.10 (making such request in opposition to motion to dismiss First Amended Complaint); *cf. Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 126 (2d Cir. 2008) (leave to amend may properly be denied for "repeated failure to cure deficiencies by amendments previously allowed" (citation omitted)).

This Court "ha[s] described the contention that [a] District Court abused its discretion in not permitting an amendment that was never requested as frivolous."

*Williams v. Citigroup Inc.*, 659 F.3d 208, 212 (2d Cir. 2011) (internal quotation marks omitted); *accord Gallop v. Cheney*, 642 F.3d 364, 369 (2d Cir. 2011). And Mr. Hughes "provides no good reason for [his] failure to have requested below the relief [he] now seeks" on appeal. *Tannerite Sports, LLC v. NBCUniversal News Grp.*, 864 F.3d 236, 253 (2d Cir. 2017). That is "particularly [true] given that," had Mr. Hughes actually accessed prerecorded videos, that would be a "fact[] that [he] knew when the operative complaint was filed." *Id.*

## CONCLUSION

This Court should either affirm the District Court's decision or remand with instructions to dismiss for lack of standing.

Date: February 10, 2025

Respectfully submitted,

*/s/ Hilary L. Preston*

Matthew X. Etchemendy
VINSON & ELKINS LLP
2200 Pennsylvania Avenue, NW
Suite 500 West
Washington, DC  20037
Phone: 202.639.6740
Email: metchemendy@velaw.com

Hilary L. Preston
Marisa Antonelli
VINSON & ELKINS LLP
1114 Avenue of the Americas
32nd Floor
New York, NY  10036
Phone: 212.237.0000
Email: hpreston@velaw.com
Email: mantonelli@velaw.com

*Counsel for National Football League*

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT</u>

1.	This brief complies with the word limits of Local Rule 32.1(a)(4) because, excluding parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 13,979 words.

2.	This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Times New Roman font.


Date: February 10, 2025

Matthew X. Etchemendy
VINSON & ELKINS LLP
2200 Pennsylvania Avenue, NW
Suite 500 West
Washington, DC  20037
Phone: 202.639.6740
Email: metchemendy@velaw.com

Respectfully submitted,

*/s/ Hilary L. Preston*
Hilary L. Preston
Marisa Antonelli
VINSON & ELKINS LLP
1114 Avenue of the Americas
32nd Floor
New York, NY  10036
Phone: 212.237.0000
Email: hpreston@velaw.com
Email: mantonelli@velaw.com

*Counsel for National Football League*

## <u>CERTIFICATE OF SERVICE</u>

Pursuant to Rule 25 of the Federal Rules of Appellate Procedure, I hereby certify that on February 10, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the U.S. Court of Appeals for the Second Circuit using the Court's Appellate Case Management System, and served copies of the foregoing via that system on all registered counsel.

Date: February 10, 2025

Matthew X. Etchemendy
VINSON & ELKINS LLP
2200 Pennsylvania Avenue, NW
Suite 500 West
Washington, DC  20037
Phone: 202.639.6740
Email: metchemendy@velaw.com

Respectfully submitted,

*/s/ Hilary L. Preston*
Hilary L. Preston
Marisa Antonelli
VINSON & ELKINS LLP
1114 Avenue of the Americas
32nd Floor
New York, NY  10036
Phone: 212.237.0000
Email: hpreston@velaw.com
Email: mantonelli@velaw.com

*Counsel for National Football League*

59